[Crim. No. 15018. In Bank. June 3, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS STANWORTH, Defendant and Appellant.

[Crim. No. 16549. In Bank. June 3, 1974.]

In re DENNIS STANWORTH on Habeas Corpus.

592

## Counsel

William R. Higham, Public Defender, Permelia A. Hulse and Peter M. Brown, Deputy Public Defenders, for Defendant and Appellant and for Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Edward P. O'Brien, George R. Nock, Robert R. Granucci and Jerome C. Utz, Deputy Attorneys General, for Defendant and Respondent.

## Opinion

**SULLIVAN, J.**—Defendant Dennis Stanworth[1] was convicted upon pleas of guilty of two counts of murder (Pen. Code, § 187),[2] one count of kidnaping for the purpose of robbery resulting in bodily harm to the victim (§ 209), four counts of kidnaping (§ 207), three counts of forcible rape (§ 261, subd. 3), one count of oral-genital copulation (§ 288a), and one

---

[1]Although the defendant is also petitioning for a writ of habeas corpus, we refer to him as defendant throughout.

[2]Hereafter, unless otherwise indicated, all section references are to the Penal Code.

count of robbery (§ 211).[3] The trial court determined that both murders were of the first degree. After a trial on the issue of penalty in respect to the charges under sections 187 and 209, a jury fixed the penalty on each of the murder counts at death and on the aggravated kidnaping count at life without possibility of parole. Judgment was pronounced accordingly.[4] On automatic appeal (§ 1239, subd. (b)), because of *Witherspoon* error (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770]), we reversed the judgment insofar as it imposed the death penalty for the murder counts but affirmed it in all other respects. (*People* v. *Stanworth* (1969) 71 Cal.2d 820, 842 [80 Cal.Rptr. 49, 457 P.2d 889].)

Prior to the second penalty trial, defendant moved to withdraw his pleas of guilty to the murder counts on the basis that they had been entered involuntarily. The motion was denied.[5] Upon retrial, a jury again fixed the

---

[3]Defendant was charged in two indictments which were later consolidated for the purpose of trial. All charges, except one, were contained in the first indictment (No. 10134) filed on August 18, 1966; the remaining count, charging defendant with the murder of Caree Collison after her death on September 12, 1966, was contained in a second indictment (No. 10173) filed on September 20, 1966. A separate judgment of death was entered on the latter indictment.

[4]Defendant was sentenced to state prison under the terms prescribed by law for the remaining counts. However, as to counts II and III of the first indictment (kidnaping and forcible rape of Susan Box), execution of sentence was stayed pending appeal and until execution of the death sentence on count I (murder of Susan Box), and permanently thereafter. As to count V (kidnaping of Caree Collison), execution of sentence was stayed pending appeal and until execution of the death sentence on the second indictment (murder of Caree Collison), and permanently thereafter. As to count VI (kidnaping of Miss W.), execution of sentence was stayed pending appeal and during the service of sentence on count VII (forcible rape of Miss W.), and permanently thereafter. As to count VIII (kidnaping of Miss S.), execution of sentence was stayed pending appeal and during the service of sentence on count IX (oral-genital copulation with Miss S.), and permanently thereafter. As to counts XI and XII (forcible rape and robbery of Mrs. D.), execution of sentence was stayed pending appeal and during the service of sentence on count X (aggravated kidnaping of Mrs. D.), and permanently thereafter.

[5]Defendant alleged that the court had the authority to set aside the pleas under section 1018, which provides in part: "On application of the defendant at any time *before* judgment the court may . . . for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted." (Italics added.) Since the motion here was made *after* judgment and its affirmance on appeal in all respects except for the penalty on the murder counts, it is apparent that the trial court had no authority to entertain the motion under section 1018. Although a motion to set aside a judgment of conviction and for permission to withdraw a plea of guilty may ordinarily be considered as a petition for writ of error *coram nobis* (*People* v. *Wadkins* (1965) 63 Cal.2d 110, 112-113 [45 Cal.Rptr. 173, 403 P.2d 429]; *People* v. *Thompson* (1949) 94 Cal.App.2d 578, 580 [211 P.2d 1]), such a petition must be addressed to the court which affirmed the judgment on appeal (§ 1265). Therefore,

penalty on each of the murder counts at death. Judgments were entered accordingly. (See fn. 3, *ante.*) Defendant is before us again on automatic appeal. (§ 1239, subd. (b).)

In *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], we held that the death penalty violated our state constitutional prohibition against cruel or unusual punishment. (Cal. Const., art. I, § 6.)[6] And in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], the United States Supreme Court ruled that imposition of the death penalty in these circumstances contravened the federal Constitution. As defendant's death penalty must therefore be set aside, it is unnecessary to consider the claims of error arising out of his second penalty trial.

We inquired of defendant whether he desired to assert any grounds for attacking the judgment of guilt as permitted by our decision in *People* v. *Ketchel* (1966) 63 Cal.2d 859, 865-866 [48 Cal.Rptr. 614, 409 P.2d 694]. As in this case, *Ketchel* involved an appeal from a second penalty trial. Inasmuch as the judgment of guilt entered after the first trial had been affirmed on the first appeal, the issues which might have been raised on appeal from the second penalty trial normally would have been limited to matters concerning the penalty. However, the defendant sought to attack the judgment of guilt on the basis of decisions rendered *after* that judgment had become final. He asserted that his confessions were improperly admitted on the issue of guilt in the first trial under newly declared constitutional standards of retroactive application.

As a matter of judicial economy, we allowed the defendant to present the argument. We explained that there "would be an unnecessary expenditure of time and money were we to reverse solely as to penalty and federal habeas corpus relief were later granted on the ground that at the guilt trial evidence was admitted that was inadmissible . . . ." (*Ketchel,* 63 Cal.2d at pp. 865-866.) And, we observed that the defendant's attack on the issue of guilt was comparable to a collateral attack and the issue would be cog-

the trial court had no authority to hear the matter after the judgment on the issue of guilt had been affirmed on appeal. The motion to withdraw the guilty pleas constituted, in effect, a collateral attack on the judgment on the issue of guilt and therefore could have been considered as a petition for a writ of habeas corpus. (§ 1473 et seq.)

The record in this case has been augmented to include the reporter's transcript of the hearing on defendant's motion.

[6]For the effect of article I, section 27, of the California Constitution on this issue, see *People* v. *Murphy* (1972) 8 Cal.3d 349, 352, footnote 2 [105 Cal.Rptr. 138, 503 P.2d 594].

nizable in a habeas corpus proceeding in this court since it involved a constitutional issue which the defendant had no prior opportunity to raise.[7] Under these circumstances, we decided that the ends of justice would be better served by considering issues as to guilt in the second appeal.

In the instant case, defendant, in response to our inquiry, filed a petition for a writ of habeas corpus rather than a supplemental brief in the appeal. We accepted this mode of attack and issued an order to show cause. The People have filed a return thereto.[8]

In this framework of review, we proceed to examine defendant's contentions in respect to the issue of guilt. Since the facts of the case are set forth in our prior opinion (see *People* v. *Stanworth, supra,* 71 Cal.2d 820, 823-828) we refrain from reiterating them at this point but will refer to them and to any additional facts presented by the record now before us as occasion requires in our discussion of a particular issue.

## I

### *The Kidnaping Convictions*

We first consider defendant's contention that the several kidnaping convictions are invalid under our decision in *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]. ▮ Defendant takes the position that the rule announced by us in *Daniels* applies not only to aggravated kidnaping (§ 209) but to so-called simple kidnaping (§ 207). We shall explain that *Daniels* does not apply to the latter classification.

In *Daniels* we held that it was the intent of the Legislature to exclude from the reach of section 209 as amended in 1951 "not only 'standstill'

---

[7]Although there has been some suggestion that the *Ketchel* doctrine is limited to errors of a federal, constitutional nature (see *People* v. *Vaughn* (1973) 9 Cal.3d 321, 326, fn. 3 [107 Cal.Rptr. 318, 508 P.2d 318]), the rationale for *Ketchel* appears to support the proposition that it permits raising any issue that could be raised on collateral attack so long as the argument relies on facts presented in the record.

[8]We have consolidated the proceedings on automatic appeal and the proceedings on habeas corpus. We therefore treat defendant's memorandum of points and authorities as having been presented to us in connection with each proceeding. We also treat the People's brief in opposition to the petition for the writ as presented in the appeal and also in support of the return to the order to show cause in the habeas corpus proceedings. Finally, we will consider the petition for the writ as a traverse to the People's return. (*In re Saunders* (1970) 2 Cal.3d 1033, 1047 [88 Cal.Rptr. 633, 472 P.2d 921].)

robberies . . . but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself. [Citations.]" (71 Cal.2d at p. 1139.)

"In *People* v. *Mutch* (1971) *supra,* 4 Cal.3d 389, 396 [93 Cal.Rptr. 721, 482 P.2d 633], we held that a defendant is entitled to habeas corpus relief under *Daniels* if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct. In *In re Madrid* (1971) 19 Cal.App.3d 996 . . . the Court of Appeal held that habeas corpus relief authorized by *Mutch* is available to a defendant whose conviction was based on a guilty plea." (*In re Crumpton* (1973) 9 Cal.3d 463, 467 [106 Cal.Rptr. 770, 507 P.2d 74].) Defendant's plea of guilty to the kidnaping charges, as in *Crumpton,* preceded the *Daniels* decision. However, the plea in *Crumpton* was an integral part of a plea bargain. We reasoned there that "[i]t would be unconscionable to hold a defendant bound by a plea made under such significant and excusable misapprehension of the law." (*Id.* at p. 468.) In the instant case, a fortiori, defendant's plea, which was not part of a plea bargain, should not be binding on him.[9]

██ We first examine in the light of these rules defendant's conviction of kidnaping for robbery (§ 209) as charged in count X of the indictment. The facts are briefly these. The victim, Mrs. D.,[10] was walking home from a shopping center in the early evening. Defendant approached her on the road, grabbed her from behind and while holding an ice pick at her throat, threatened to have sexual intercourse with her. He dragged her onto an open field approximately 25 feet from the road, bound her hands with wire and forcibly raped her. Before fleeing, defendant took approximately $15 from the victim's purse.

Comparing the circumstances involving a charge of aggravated kidnaping in *People* v. *Daniels, supra,* 71 Cal.2d at pages 1124-1125, with the undisputed facts in the present case, it is apparent that defendant's conviction cannot stand. In *Daniels,* the defendants, armed with a gun, forced

---

[9]We reject as we did in *Crumpton* the People's argument that absent a complete trial record, defendant cannot meet his burden of demonstrating undisputed facts. (*Crumpton,* 9 Cal.3d at pp. 467-468.) In *Crumpton,* having decided that additional evidence could not have had a significant impact in reconstructing the events leading to the kidnaping charges, we relied solely on the transcript of the preliminary hearing. In the present case, the events resulting in kidnaping charges against defendant are adequately described in the record of the second penalty trial.

[10]Each of the living victims will be referred to merely by an initial.

entry into the victim's apartment. Holding her at gunpoint, they walked her a distance of about 30 feet, first to the kitchen and then to the bedroom where each of them raped her. They warned her not to move and, upon leaving, took money from her purse. In reversing the convictions arising from this incident and similar ones, we said, "defendants had no interest in forcing their victims to move just for the sake of moving; their intent was to commit robberies and rapes, and the brief movements which they compelled their victims to perform were solely to facilitate such crimes." (*People* v. *Daniels, supra,* 71 Cal.2d 1119, 1130-1131.) We also concluded that the brief movements of the victims "did not substantially increase the risk of harm otherwise present." (*Id.* at p. 1140.) In the case at bench, the asportation of the victim was for a distance slightly less and was accomplished for the specific purpose of raping and robbing her. Thus the movement of the victim cannot be regarded as substantial and was merely incidental to the commission of those crimes.

The People assert that the risk of harm was significantly increased here because defendant moved the victim from the road, an area of relative safety, to an adjacent field where it was easier for him to inflict bodily harm upon his prey. (See *People* v. *Hill* (1971) 20 Cal.App.3d 1049, 1052-1053 [98 Cal.Rptr. 214].) Under *Daniels,* the "risk of harm" factor refers to the risk created by the victim's movements that he will "suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed"; it does not refer to the increased risk that the crime of robbery will be committed. (*People* v. *Timmons* (1971) 4 Cal.3d 411, 414 [93 Cal.Rptr. 736, 482 P.2d 648].) However, "acts of removing the victim from public view do not *in themselves* substantially increase the risk of harm within our rule in *Daniels.*" (*In re Crumpton, supra,* 9 Cal.3d 463, 467; italics added.) In any event, contrary to the People's argument, there is no evidence that the relatively brief movement of the victim here removed her from public view or in any other manner substantially increased the risk, beyond that inherent in the underlying crimes, that she would suffer physical harm. We conclude that under the undisputed facts, defendant's conduct did not constitute a violation of section 209 and that his conviction on this count must be reversed.

■ We turn to the four convictions of simple kidnaping (§ 207) as charged in counts II, V, VI and VIII of the indictment. We emphasize at the outset that the rule articulated by us in *People* v. *Daniels, supra,* 71 Cal.2d at page 1139 is not applicable to kidnaping charged as a violation of section 207 but only to charges of kidnaping for robbery bottomed on section 209, commonly referred to as aggravated kidnaping. Nor did we indicate in any way in *Daniels* that our rule was applicable to

charges under section 207; if defendant's argument is intended as an invitation to extend the rule to all types of kidnaping, we decline to do so.[11] As we have explained, the *Daniels* rule consists of two factors: first, a movement of the victim other than that which is merely incidental to the robbery of the victim; and, second, a substantial increase in the risk of harm over and above that necessarily present in the robbery. Both factors are evaluated in the context of the commission of the underlying crime. As will be made clear, neither applies to a charge of simple kidnaping.

A careful reading of *Daniels* in conjunction with section 207[12] makes clear that while the rationale for the first factor of the *Daniels* rule was developed from our earlier opinion in *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459 [15 Cal.Rptr. 65, 364 P.2d 241], a case dealing with section 207, the "movement of the victim" factor is by its very terms inapplicable to section 207. The kidnaping charges in *Cotton*, based on an alleged violation of section 207, arose from an altercation between union organizers and farm workers in a farm labor camp. During the fighting one farm worker was chased, another was pushed and a third dragged for a distance of 15 feet. The union organizers were charged with rioting, assault

---

[11]One commentator has interpreted our decision in *People* v. *Williams* (1970) 2 Cal.3d 894 [88 Cal.Rptr. 208, 471 P.2d 1008], cert. den., 401 U.S. 919 [27 L.Ed.2d 821, 91 S.Ct. 903], to mean that the *Daniels* rule applies to simple kidnaping. (Witkin, Cal. Crimes (1973 Supp.) p. 182.) However, *Williams* involved a conviction of aggravated kidnaping under section 209 which was reduced by the court to simple kidnaping under section 207 in order to avoid the harsher penalty imposed by the former section. (*Williams* at pp. 899, 902-903.) Under these circumstances, we evaluated the conviction in the light of *Daniels*.

We also note that one of the new death penalty provisions enacted by the Legislature in 1973, requires imposition of the death sentence where the defendant is found guilty of first degree murder and it is found that the murder was committed during the commission or attempted commission of kidnaping under section *207* or 209. (§ 190.2, subd. (b)(3)(ii).) Although the subdivision appears to contain a restatement of the *Daniels* rule, we express no opinion as to the effect of the above legislation.

[12]Section 207 provides: "Every person who forcibly steals, takes, or arrests any person in this state, and carries him into another country, state, or county, or into another part of the same county, or who forcibly takes or arrests any person, with a design to take him out of this state, without having established a claim, according to the laws of the United States, or of this state, or who hires, persuades, entices, decoys, or seduces by false promises, misrepresentations, or the like, any person to go out of this state, or to be taken or removed therefrom, for the purpose and with the intent to sell such person into slavery or involuntary servitude, or otherwise to employ him for his own use, or to the use of another, without the free will and consent of such persuaded person; and every person who, being out of this state, abducts or takes by force or fraud any person contrary to the law of the place where such act is committed, and brings, sends, or conveys such person within the limits of this state, and is afterwards found within the limits thereof, is guilty of kidnaping."

and simple kidnaping. In ordering that prosecution of the kidnaping charges be restrained, we stated, "it does not seem reasonable that the California Legislature, in enacting Penal Code section 207, intended the statute to apply to a case of assault or riot such as occurred in the case now engaging our attention. Such a holding could result in a rule that every assault could also be prosecuted for kidnapping under Penal Code section 207, as long as the slightest movement was involved. Where the movement is incidental to the alleged assault, Penal Code section 207 should not have application, as the Legislature could not reasonably have intended that such incidental movement be a taking '. . . from one part of the county to another.'" (56 Cal.2d at p. 465.)

In *Daniels*, we observed that section 209 fails to define the term "kidnaps" in that section and concluded that the Legislature must have intended the term to have the same meaning as the word "kidnaping" used in section 207. (*Daniels*, 71 Cal.2d at p. 1131.) In sum, both *Daniels*, involving section 209 kidnaping, and *Cotton*, involving section 207 kidnaping, construe the term "kidnaping" to mean movements which are not merely incidental to associated crimes.

However, the "movement" factor of the *Daniels* rule is uniquely suited to section 209 and not to section 207. The rule concerns one type of kidnaping described in section 209 which, by definition, involves the underlying offense of robbery.[13] In contrast, kidnaping, as defined by section 207, may occur in the absence of another crime. Thus where only simple kidnaping is involved, it is clear that the victim's movements cannot be evaluated in the light of a standard which makes reference to the commission of another crime. Coincidentally, *Cotton* did involve related charges of rioting and assault. Because the victim's movements were not substantial, we concluded that those movements were "only incidental to the assault and rioting." (*Cotton*, 56 Cal.2d at p. 464.) Nevertheless, the central thrust of *Cotton* is contained in our reasoning that the Legislature did not intend to apply criminal sanctions where the "slightest movement" is involved. (*Cotton*, 56 Cal.2d at p. 465.)

In enacting section 207, the Legislature did not provide a definition of kidnaping that involves movements of an exact distance; rather, it

---

[13]Section 209 provides in part: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or friends of such person any money or valuable thing, or *any person who kidnaps or carries away any individual to commit robbery*, or any person who aids or abets any such act, is guilty of a felony . . . ." (Italics added.)

defined it in minimum terms as forcible movements "into another part of the same county." (§ 207.) Indeed, "to define the phrase, 'another part of the same county,' in terms of a specific number of inches or feet or miles would be open to a charge of arbitrariness. . . . [Nonetheless] [t]he law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' 'substantial,' and the like." (*Daniels*, 71 Cal.2d at pp. 1128-1129.)

Of course in the application and enforcement of the section, it is our duty to avoid "absurd consequence[s]" and achieve a "sensible construction." (*Cotton*, 56 Cal.2d at p. 465.) "[T]he statute is to be given effect in its commonsense meaning." (*People* v. *Rocco* (1971) 21 Cal.App. 3d 96, 105 [98 Cal.Rptr. 365].) In performing that duty, it is imperative to refer to the language of section 207 itself. The section defines kidnaping in part as movement "into another country, state, or county, or into another part of the same county."[14] The statutory language implies that the determining factor in the crime of kidnaping is the actual distance of the victim's movements; and further, that the minimum movements necessary for the commission of the crime are present where the victim is forcibly taken "into *another part* of the same county." (Italics added.) Finally, because the victim's movements must be more than slight (*Cotton*, 56 Cal.2d at p. 465) or "trivial" (*People* v. *Rocco, supra,* 21 Cal.App.3d 96, 105), they must be substantial in character to constitute kidnaping under section 207.

Neither does the second factor of the *Daniels* rule—an increase in the risk of harm above that present in the underlying crime—apply to simple kidnaping. A kidnaping under section 207 does not of necessity occur in connection with another offense. (*People* v. *Apo* (1972) 25 Cal.App.3d 790, 797 [102 Cal.Rptr. 242].) Moreover, this second factor has its origin not in section 207 but in section 209 itself. (See fn. 13, *ante.*)

Accordingly, in our examination of the four kidnaping convictions under section 207, we do not apply the rule announced by us in *Daniels*. ■ We start by considering together the two kidnapings involving Susan Box and Caree Collison, victims also involved in the murder counts.

---

[14]The phrase "into another part of the same county" was added by amendment in 1905. A code commissioner's note states that the "advisability" of the amendment is demonstrated by the decision in *Ex parte Keil* (1890) 85 Cal. 309, 312 [24 P. 742], where this court held that the forcible taking of the victim from San Pedro to Santa Catalina Island, both in the same county, did not constitute kidnaping as defined by the section prior to 1905.

Defendant came upon the two victims as they were attempting to "hitch" a ride near a gas station in Pinole. He drove past them, but then returned to offer them a ride. They explained that they wanted to go to Berkeley and he agreed to take them there. However, he admitted at the penalty trial it was his intention at the outset to rape and murder them. When the victims told him that he was not driving in the direction of Berkeley, he explained that he intended first to stop briefly at a lumber yard. Instead, he drove them to Point Wilson overlooking San Pablo Bay. He stopped near some railroad tracks, removed a .22 caliber pistol that was hidden under the front seat of the vehicle, pointed the gun at the victims and ordered them to walk to a small hill approximately one-quarter of a mile away.

Upon reaching the hill, defendant ordered the girls to disrobe. Caree began to run away but returned when he threatened to kill Susan. Without further word he fired two shots into Caree's head. He then shot Susan in the head, undressed her and proceeded to have sexual intercourse with her. Afterwards he placed both bodies under a bush and covered them with branches. As he was leaving, he heard a groaning sound and fired another shot at the victims.

The bodies were not discovered for two days. Susan was dead. Caree was in a comatose state and died nine days later. There was evidence that Susan had a puncture wound in her chest, a burned or blistered area on one leg and scratches and abrasions about her body. Based on this incident, defendant was convicted of the kidnap and murder of Caree Lee Collison and the kidnap, rape and murder of Susan Muriel Box.

Defendant contends that in determining whether a kidnaping occurred, involving movements solely within the state, we must consider only those movements produced by force. The initial movement in the car from Pinole to Point Wilson, he explains was accomplished because of the victims' belief that defendant would drive them to Berkeley. Hence the forcible movements of the victims did not commence until he stopped the car near the railroad tracks at Point Wilson where he ordered the victims at gunpoint to the hill.

Defendant's reading of the statute is correct. (See *People* v. *Stephenson* (1974) 10 Cal.3d 652, 660 [111 Cal.Rptr. 556, 517 P.2d 820]; *People* v. *Rhoden* (1972) 6 Cal.3d 519, 526-527 [99 Cal.Rptr. 751, 492 P.2d 1143].) As we explained in *Rhoden,* section 207 contains three distinct definitions of kidnaping. (See fn. 12, *ante.*) The first is a general definition containing the elements of the use of force. The latter two are special

definitions which for example may involve movements induced by fraud; however, they are limited to movements out of the state for purposes of slavery or movements into the state for any purpose. Inasmuch as defendant was charged under the general definition of kidnaping, only those movements accomplished by force are pertinent.

Nevertheless, we cannot conclude as a matter of law from the uncontradicted evidence in the record that defendant did not commit the act of kidnaping when he forced the victims at gunpoint to walk for a distance of one-quarter of a mile. Such a distance cannot be reasonably regarded as slight or insubstantial (cf. *People* v. *Apo, supra,* 25 Cal.App.3d 790, 794 [simple kidnaping occurred where school officials were forced to walk a distance of 700 yards]); thus, within the meaning of section 207, it constituted movement "into another part of the same county." Consequently, the convictions for kidnaping both girls must stand.

We next take up the third and fourth convictions of kidnaping under section 207. (Counts VI and VIII.) Since they raise similar issues, we consider them together.

The conviction on count VI involved the kidnaping of Miss W. In the late afternoon the victim was driving out of a parking lot at her place of employment in Richmond. While she was stopped at a stop sign, defendant approached and asked for a ride to his car parked down the street. She refused and he reached into the car, unlocked it and entered on the passenger side. He held a knife at her stomach and ordered her to drive, directing her through several side streets in Richmond until she reached a freeway. She left the freeway and continued on to the south end of the parking lot of Golden Gate Fields in Berkeley. The record before us does not indicate the actual distance traveled.

When the car was parked, defendant bound the victim's hands with wire, partially undressed her and then committed the act of rape. While having sexual intercourse defendant stated that he was going to kill her and began choking her at the throat until she lost consciousness. When she regained consciousness, defendant untied her hands, allowed her to dress and then drove her back to the store parking lot.

The conviction on count VIII involved the kidnaping of Miss S., a high school student 17 years of age. As the victim was driving out of a school parking lot in Richmond in the early evening, defendant approached her car. He entered on the passenger side and held a knife to her stomach, explaining that she would not get hurt if she did what he wanted. He

directed her to a side street, bound her hands with wire and forced her to the floorboard in the front seat of the vehicle. Defendant then drove the vehicle for an estimated distance of five to ten miles to Point Richmond where he forced her onto the beach area. He removed her clothing, began to fondle her and then forced his penis into her mouth. Defendant then drove the victim back to the school parking lot, returning her clothing and threatened to harm her if she reported the incident to the police. He was convicted of both kidnaping (§ 207) and oral-genital copulation (§ 288a) based on the foregoing incident.

From the facts that appear in both incidents, the movements of the victims in their vehicles cannot be reasonably regarded as trivial. As to Miss W., the actual distance is not revealed in the record but it is apparent that the forcible movements she experienced were substantial. The victim was forcibly taken through Richmond, onto a freeway and then to a parking lot in Berkeley. (Cf. *People* v. *Rocco, supra,* 21 Cal.App.3d 96, 101 [kidnaping occurred where victim taken from apartment building in Berkeley to unpopulated place in same city].) As to Miss S., the distance was estimated to be five to ten miles. In sum, we are not able to say that the asportation was so insubstantial or slight that it did not constitute movement "into another part of the same county"; therefore, the conviction of kidnaping under count VI and count VIII must stand.

## II

### *The Rape Conviction*

■ Defendant contends that since rape, as defined by the Penal Code, may not be accomplished with a dead person, his conviction of the rape of Susan Box is invalid. The evidence demonstrates, he states, that before having sexual intercourse with the victim, he first fired a shot into her head, causing "almost instantaneous" death. Thus, defendant asserts that his conviction under section 261, subdivision 3, must be set aside because "there is no material dispute as to the facts relating to his conviction and . . . it appears that the statute under which he was convicted did not prohibit his conduct." (*In re Zerbe* (1964) 60 Cal.2d 666, 668 [36 Cal.Rptr. 286, 388 P.2d 182, 10 A.L.R.3d 840].)

Whatever the validity of defendant's basic premise,[15] he cannot attack

---

[15]The issue raised, at least in respect to a conviction of the crime of rape itself, appears to be one of first impression. In two prior cases (*People* v. *Goodridge* (1969) 70 Cal.2d 824, 838 [76 Cal.Rptr. 421, 452 P.2d 637]; *People* v. *Quicke* (1964) 61 Cal.2d 155, 158-159 [37 Cal.Rptr. 617, 390 P.2d 393]), the issue arose in

his conviction which was entered on his plea of guilty. By entering such a plea to rape, he admitted each element of the offense. (*People* v. *Laudermilk* (1967) 67 Cal.2d 272, 281-282 [61 Cal.Rptr. 644, 431 P.2d 228], cert. den., 393 U.S. 861 [21 L.Ed.2d 128, 89 S.Ct. 139]; *People* v. *Ward* (1967) 66 Cal.2d 571, 575 [58 Cal.Rptr. 313, 426 P.2d 881]; *People* v. *Jones* (1959) 52 Cal.2d 636, 651 [343 P.2d 577], cert. den., 361 U.S. 926 [4 L.Ed.2d 350, 80 S.Ct. 364]; *Stephens* v. *Toomey* (1959) 51 Cal. 2d 864, 869 [338 P.2d 182].) Having done so, defendant is precluded from presenting the issue in this consolidated proceeding.

It is clear that the claim is not cognizable on habeas corpus. As on appeal from a judgment of conviction based on a plea of guilty,[16] defendant must demonstrate more than mere legal error or irregularities in the trial court's proceedings; he must show that the trial court exceeded its jurisdiction in some manner. (§ 1487, subd. 1; Witkin, Cal. Criminal Procedure (1963) § 799, pp. 771-773.) For example, in *In re Zerbe, supra,* 60 Cal.2d 666, 668, we stated that where it appears, under undisputed

---

a different context. Those cases involved convictions of murder in the first degree—not a conviction of rape—reached by application of the felony-murder doctrine (§ 189). The defendant in each case had apparently killed the victim prior to perpetrating the sexual attack. Since section 189 provides that murder is in the first degree where it "is committed in the perpetration of, *or attempt to perpetrate . . .* rape" (italics added), it is inconsequential for the purpose of a first degree murder conviction that the death of the victim preceded the sexual attack.

Rape is defined in section 261 as "an act of sexual intercourse, accomplished with a female not the wife of the perpetrator . . . ." The statute, on its face, does not indicate whether a "female" must be alive at the time the act of sexual intercourse is performed. However, section 263 states that "[t]he essential guilt of rape consists in the outrage to the person and feelings of the female. Any sexual penetration, however slight, is sufficient to complete the crime." (See also 1 Witkin, Cal. Crimes (1963) § 284, p. 263; Fricke & Alarcon, Cal. Criminal Law (10th ed. 1970) p. 221; see generally 2 Burdick, Law of Crime (1946) § 471 et seq.) It is manifest that the "feelings" of a female cannot be offended nor does the victim suffer "outrage" where she is dead when sexual penetration has occurred. Thus it appears that a female must be alive at the moment of penetration in order to support a conviction of rape under section 261.

Nevertheless, dead bodies are not without protection; the Legislature has enacted a comprehensive body of law to this end codified in the Health and Safety Code (div. 7; § 7000 et seq.) In protecting the physical integrity of a dead body, section 7052 of the Health and Safety Code makes it a felony to mutilate, disinter or remove from the place of interment "any human remains without authority of law . . . ."

[16]On direct appeal from the judgment after the first penalty trial, defendant could have raised issues concerning the jurisdiction or legality of the proceedings but not the merits of the judgment of conviction. (*Stephens* v. *Toomey, supra,* 51 Cal.2d at p. 870; Witkin, Cal. Criminal Procedure, *supra,* § 639, p. 631.) This rule of limited appeal from a judgment of conviction based on a guilty plea is now implemented by statute in section 1237.5. (See Witkin, Cal. Criminal Procedure (1973 Supp.) p. 514.)

facts, that defendant's conduct was not prohibited by the statute under which he was convicted, the court had exceeded its jurisdiction in pronouncing a judgment of conviction. Under those circumstances we held that collateral relief was available. (See also *People* v. *Mutch, supra,* 4 Cal.3d 389, 396; *In re Bevill* (1968) 68 Cal.2d 854, 863 [69 Cal.Rptr. 599, 442 P.2d 679]; *In re Murdock* (1968) 68 Cal.2d 313, 316 [66 Cal. Rptr. 380, 437 P.2d 764].)

However, unlike *Zerbe,* defendant in the instant case pleaded guilty to a charge of rape. ■ A plea of guilty, as we have explained, admits each element of the offense; moreover, " 'it is itself a conviction; nothing more remains but to give judgment and determine punishment.' [Citations.]" (*In re Williams* (1969) 1 Cal.3d 168, 175 [81 Cal.Rptr. 784, 460 P.2d 984].) ■ Neither does there exist an "excusable misapprehension of the law" (*In re Crumpton, supra,* 9 Cal.3d 463, 468), such as occurred in *Crumpton.* We granted relief there because a conviction of aggravated kidnaping (§ 209) based on a guilty plea preceded the *Daniels* decision, announcing an interpretation of section 209 which could not have been reasonably anticipated. We are not confronted here with a similar situation in respect to the rape statute (§ 261). Under these circumstances it cannot be said that the trial court exceeded its jurisdiction in pronouncing a judgment of conviction.

For the same reason defendant's contention is not cognizable under our decision in *People* v. *Ketchel, supra,* 63 Cal.2d 859. *Ketchel* permits an attack on the judgment on the issue of guilt on appeal from the second penalty trial in order to promote judicial economy. Since Ketchel's claim relating to the issue of guilt could have been raised on habeas corpus (the judgment on the issue of guilt having been affirmed on the first appeal) we considered the claim on Ketchel's appeal from the second penalty trial. However, as we have stated, defendant's contention cannot be raised in a collateral attack since the court did not exceed its jurisdiction in entering the judgment of conviction on his plea of guilty to rape.

Even if the argument were cognizable in this consolidated proceeding, defendant would not be entitled to relief since there is a material dispute in the facts. (*Zerbe,* 60 Cal.2d at p. 668.) Defendant refers only to evidence favorable to him, tending to establish that the death of the victim preceded the sexual attack. He refers to his extra-judicial confession given on August 12, 1966, wherein he stated that he shot the victim in the head, removed her clothing and then sexually molested her, and that he "figured" she was dead when the latter act occurred. Further, Dr. William M. Bogart, the pathologist who performed the autopsy on the victim, con-

cluded that the death of the victim was "almost instantaneous" after being shot. However, the record also reveals that defendant stated to Dr. Rapaport, one of the psychiatrists examining him prior to the 1966 trial, that the victim was screaming during the sexual attack thus implying that she was alive at that time. Defendant retracted this statement at the second penalty trial, explaining that it was he who was screaming and not the victim. Nevertheless, we conclude that it is a disputed issue of fact whether the sexual attack on Susan Box preceded or followed her death.

## III

### Assistance of Counsel

■ Defendant contends that he was deprived of his constitutional right to the effective assistance of counsel at three stages. He asserts, first, that counsel appointed to represent him immediately after his arrest failed to adequately perform his duties in connection with defendant's confession; second, that his counsel appointed to represent him at trial rendered ineffective assistance in connection with the entry of his plea; and finally, that appellate counsel, who also served as trial counsel, inadequately represented him on the first appeal by failing to raise specified errors of the trial court.

In *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487], we held that it is the duty of counsel "to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled." However, effective counsel does not mean errorless counsel; "[t]o justify relief on this ground, 'an extreme case must be disclosed.' [Citations.] It must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or a sham.' [Citations.]" (*Ibid.*)

We begin with a discussion of the representation given by defendant's first counsel at the time defendant gave an extrajudicial statement to the police and others concerning his involvement in the crimes. The record reveals that on August 3, 1966, defendant was arrested in San Mateo County on charges for which he was never brought to trial. While in custody on August 12 defendant decided to confess to the crimes committed in Contra Costa County involving the sexual offenses, kidnaping, robberies and murders previously described. San Mateo authorities informed both Contra Costa authorities and defendant's then appointed counsel that defendant wished to make a statement. Counsel consulted

with defendant beforehand and advised him that he was under no obligation to do so. His attorney and the deputy district attorney who interrogated defendant fully advised him of his constitutional rights. Counsel was present when the confession was given. According to defendant's testimony at the first penalty trial, the statement was given at his request because he had to "get it off his chest."

It is argued that counsel rendered ineffective assistance in failing to advise defendant that he need not speak to the police and in failing to inquire of defendant as to the content of his contemplated statement to the authorities. The claim is without merit. Defendant's assertion that counsel failed to advise him of his right to remain silent is wholly without support in the record. Moreover, counsel's failure to inquire about the exact nature of defendant's intended statement did not constitute ineffective assistance of counsel. Having advised defendant of his rights and having satisfied himself that defendant's decision was free and voluntary and with the intention of speaking the truth, counsel was not required under the circumstances to inquire of defendant as to what possible responses he would make to the interrogation to which he chose to subject himself.

■ Turning to defendant's charge of inadequacy against his trial counsel, defendant complains that his attorney should not have permitted him to enter guilty pleas because (1) the kidnaping charges were invalid under the rule set forth in *People* v. *Daniels, supra,* 71 Cal.2d 1119; (2) the pleas precluded him from raising the defense of diminished capacity; and (3) he could not have been guilty of the rape of Susan Box since she was not alive when he sexually attacked her.[17] Inasmuch as we have concluded that the record is in conflict as to whether the victim was alive when defendant sexually attacked her, we need not further consider the third ground asserted.

Before discussing the first and second grounds, we must consider the People's assertion that the competence of trial counsel was decided on the prior appeal from the first penalty trial. (See *People* v. *Stanworth, supra,* 71 Cal.2d 820, 831.) Expressing a desire to receive punishment for his crimes without delay, defendant attempted to dismiss the prior appeal and to discharge his appellate counsel, who had also been his trial

---

[17]Defendant also argues that the entry of the guilty pleas resulted in an "obvious abandonment of any meaningful attempt to suppress the confession" made on August 12, 1966. However, the record reveals that the confession was given on the initiative of defendant, that he was fully informed of his constitutional rights, and that counsel was present throughout the interrogation. Therefore, trial counsel could reasonably conclude that the confession would not be excluded as involuntary. (Cf. *In re Beaty* (1966) 64 Cal.2d 760, 765 [51 Cal.Rptr. 521, 414 P.2d 817].)

counsel. We rejected defendant's claim and, anent the attempt to discharge counsel, observed that "there is nothing in the record before us, either upon an examination of the trial court proceedings, the briefs on appeal, or other matters that have been directed to our attention, which even suggest that counsel has conducted the trial or appeal in defendant's behalf in other than a competent, professional and skillful manner, always to the end of relieving defendant of the consequences of the crimes charged." (*Id.* at pp. 831-832.) Even if it could be said that the issue of the competence of defendant's counsel had been decided, given the context in which the issue arose, our comments respecting the issue were based on the record then before us. This does not prevent the issue from now being raised again based on the record in this case, including the transcript of the second penalty trial and the transcript of the hearing on defendant's motion to set aside his guilty pleas in which both defendant and his counsel testified concerning the representation given by the former.

The first charge of ineffective counsel urged by defendant lacks merit. Since the convictions under section 207 were valid, counsel could not have rendered ineffective assistance in advising or permitting defendant to enter pleas of guilty to the four counts under that section. Further, we need not discuss whether counsel was adequate in permitting a guilty plea to one count of aggravated kidnaping under section 209 because we have decided that the *Daniels* rule requires that conviction to be reversed. Counsel's assistance in this regard could not have been inadequate in any event as the plea preceded the *Daniels* decision.

We therefore turn to consider the second ground, specifically, that counsel at trial failed to undertake an adequate factual inquiry in determining the possible existence of the defense of diminished capacity, resulting in the withdrawal of a crucial defense.[18]

The record indicates that on August 17, 1966, defendant was charged by the first indictment. On August 31, 1966, pursuant to a motion made by defendant's counsel, the proceedings were suspended under section

[18]Defendant points to several facts which he believes should have prompted a factual inquiry on the defense of diminished capacity. He refers to the fact that he received psychiatric treatment while in military service a few years prior to the commission of the offenses and also that he attempted suicide at least twice while in custody and prior to the entry of the guilty pleas. However, defendant does not assert that counsel was aware of either fact. On the other hand, we may assume that counsel was aware of—as defendant describes it—the nature of the crimes charged and defendant's "self-destructive behavior" as evidenced by his desire to plead guilty and receive punishment for the crimes.

1368 in order to determine whether defendant was competent to stand trial. Dr. Rood and Dr. Peretti, appointed by the court to examine defendant, concluded that he was "sane and understands the nature of the proceedings."[19] On September 22, 1966, the issue was submitted on the basis of the medical reports. Finding defendant sane for the purpose of trial, the court reinstated the proceedings. At the same time the court ordered that the sum of $350 be provided so that defendant could be examined by a psychiatrist of his choice. Because defendant had entered pleas of not guilty by reason of insanity, the court also appointed Dr. Rood and Dr. Peretti to examine defendant and later testify at trial, if required, on the issue of sanity. (§ 1027.)

In the meantime, defendant failed to cooperate with his attorney in preparing his defense. At the hearing on defendant's motion to set aside his guilty pleas, counsel testified that defendant wanted to avoid a trial and insisted on pleading guilty, emphasizing on frequent occasions that "I want to get it over with." However, counsel advised that the defense of insanity should be considered. Defendant expressed reluctance to being examined by psychiatrists and insisted on abandoning the insanity defense. His testimony at the hearing was consistent with the testimony of his former counsel. He affirmed that he repeatedly insisted on pleading guilty and admitted that counsel discussed the defense of insanity. However, according to defendant, counsel did not discuss the defense of diminished capacity at any time.

On September 29, 1966, defendant entered pleas to the charges contained in both indictments. He pleaded not guilty by reason of insanity to all charges and, at the same time, additional pleas of not guilty to the four charges for simple kidnaping, one charge of aggravated kidnaping and one charge of robbery. Thus he admitted the commission of the remaining charges—two murder counts, three counts of forcible rape and one count of oral-genital copulation. (§ 1016.)

We find nothing in the record directly explaining why defendant entered single pleas of not guilty by reason of insanity to some of the charges, thereby withdrawing a possible defense of diminished capacity on those

---

[19]The record also reveals that Dr. Rapaport examined defendant at the request of the district attorney and with defendant's consent. Although it is not clear that Dr. Rapaport's report was considered by the court, it concluded, as indicated by Dr. Rapaport's testimony at the second penalty trial and in the hearing on defendant's motion to set aside his guilty pleas, that defendant suffered from no mental disorder, that he was legally sane, and that his capacity to commit the crime was not diminished.

charges. However, counsel's advice appears to have been based on his belief that the defense was not viable. At the hearing held before the second penalty trial on defendant's motion to withdraw his guilty pleas, defense counsel was asked whether the psychiatric reports submitted by Dr. Rood and Dr. Peretti indicated that a mental defense might be raised and he replied in the negative. Although he recalled that one of the reports referred to defendant as a "sexual psychopath," he stated that none of the reports characterized defendant as having the kind of mental defects that could be asserted as a defense. Counsel's testimony concerning defendant's mental condition was confirmed by Dr. Rood and Dr. Rapaport, prosecution witnesses at the second penalty trial. Based on his examination in 1966, Dr. Rood testified that defendant "had no mental illness or condition" and that he "had the capacity" to commit the crimes. Dr. Rapaport stated that his "examination revealed no evidence of a mental illness" or of diminished capacity.[20]

On November 14, 1966, defendant pleaded guilty to all charges. Defendant does not assert that counsel advised him to plead guilty; rather, it appears that counsel acquiesced in defendant's insistence on pleading guilty.

■ Under the applicable legal standards, counsel has a "duty to conduct careful factual and legal investigations and inquiries with a view to developing matters of defense in order that he may make informed decisions on his client's behalf both at the pleading stage [citations] and at trial [citations]. If counsel's 'failure [to undertake such careful inquiries and investigations] results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled.' [Citations.]" (*In re Saunders, supra,* 2 Cal.3d 1033, 1041-1042.) ■ Although "[t]he decision to plead guilty or not guilty was for [defendant] to make" (*In re Beaty, supra,* 64 Cal.2d 760, 765; see also § 1018), he was " 'entitled to rely upon his counsel to make an independent examination

---

[20]Defendant argues that an adequate factual inquiry would have revealed the existence of diminished capacity. He relies on the testimony of Dr. Carfagni, a psychiatrist who examined defendant in 1969 and testified that defendant suffered a "psychiatric disorder" and had "severe problems in the psychosexual area." Dr. Carfagni agreed that defendant was legally sane and suffered from no psychosis but had a "tentative opinion" that defendant's emotional disorders "would go to the impairing of . . . various capacities to formulate and various intents . . . ." Dr. Carfagni explained that in using the term "tentative," he meant that he was still examining defendant in order to fully understand his mental condition; at the same time, it was his opinion "to a reasonable medical certainty" that defendant's capacity to commit the crimes was diminished. In addition, Dr. Pierce, a psychologist who examined defendant in 1969, testified that defendant's "capacity to not only include right or wrong in his actions, but even to reflect on what he was doing in a meaningful way in terms of the consequences of it was grossly diminished."

of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered.' [Citation.]" (*In re Williams, supra,* 1 Cal.3d 168, 175, fn. omitted.)

"[E]vidence of mental abnormality not amounting to insanity is admissible on the guilt phase of a trial to negate the specific mental states put in issue by the not guilty plea. (*People* v. *Wells* (1949) 33 Cal.2d 330 . . . ; *People* v. *Gorshen* (1959) 51 Cal.2d 716 . . . ." (*People* v. *Mc-Dowell* (1968) 69 Cal.2d 737, 738-739 [73 Cal.Rptr. 1, 447 P.2d 97].) The defense of diminished capacity is a "significant issue" where there is substantial evidence to support it (*id.* at p. 747); it constitutes a "crucial issue" within the meaning of *People* v. *Ibarra* (*In re Saunders, supra,* 2 Cal.3d 1033, 1049.)

In *People* v. *Miller* (1972) 7 Cal.3d 562, 569-570 [102 Cal.Rptr. 841, 498 P.2d 1089], we explained that there are generally three reasons why counsel may elect not to assert the defense of diminished capacity: (1) Where counsel "did not know the *facts,* i.e., that diminished capacity existed or could be developed by proper trial preparation" (see, e.g., *In re Saunders, supra,* 2 Cal.3d 1033, 1048-1049; *Brubaker* v. *Dickson* (9th Cir. 1962) 310 F.2d 30, 39); (2) where "counsel knew the existence of facts tending to show diminished capacity but did not know the *law,* i.e., that such evidence is admissible at the guilt phase" (see, e.g., *People* v. *McDowell, supra,* 69 Cal.2d 737); and (3) where "counsel knew the facts of the defendant's mental state and the law of diminished capacity, but chose to withhold such evidence as a matter of tactics, usually until a later phase of the trial" (see, e.g., *People* v. *Goodridge* (1969) 70 Cal.2d 824 [76 Cal.Rptr. 421, 452 P.2d 637]; *People* v. *Fain* (1969) 70 Cal.2d 588 [75 Cal.Rptr. 633, 451 P.2d 65]).[21]

Where the facts establish that counsel was ignorant of the facts or the law and it appears that such ignorance caused the withdrawal of a crucial defense, his client is entitled to relief. On the other hand, where it appears that counsel decided to withhold a defense as a matter of tactics, "we have uniformly declined the defendant's invitation to second-guess his counsel[ ]" (*Miller* at p. 570) except where the decision is made in the

[21]Other tactical considerations may be present. For example, counsel may be confronted with the dilemma of inconsistent defenses and choose to withhold one. (See *People* v. *Miller, supra,* 7 Cal.3d at pp. 572-573.) Or counsel may advise acceptance of a plea bargain where a defense appears insubstantial or its success uncertain. (See, e.g., *In re Downs* (1970) 3 Cal.3d 694, 700 [91 Cal.Rptr. 612, 478 P.2d 44]; *In re Hawley* (1967) 67 Cal.2d 824, 829-830 [63 Cal.Rptr. 831, 433 P.2d 919].)

absence of a proper factual inquiry (*In re Saunders, supra,* 2 Cal.3d 1033, 1049).[22]

■ Defendant bears the burden of establishing ineffectiveness of counsel (*In re Downs, supra,* 3 Cal.3d 694, 698) and we think he has failed to meet his burden in this case. Here, unlike *Saunders,* the record shows that counsel did undertake a factual inquiry on the issue of diminished capacity. Counsel's concern about the mental capacity of his client was first expressed when he requested that the proceedings be suspended under section 1368 in order to determine defendant's sanity. The psychiatrists who examined defendant concluded that he was sane and there was nothing contained in their reports to indicate that defendant's capacity to commit the crimes was diminished. Counsel also obtained a court order to provide money for an examination by a psychiatrist selected by defendant. However, the record does not reveal whether this examination was made or, if so, whether counsel relied on its results in acquiescing to defendant's decision to enter guilty pleas to all charges.

In sum, the record demonstrates that defense counsel did undertake an inquiry to determine the mental capacity of defendant and that he found no evidence of diminished capacity. Defendant's ability to produce conflicting evidence four years later does not in itself establish that the factual inquiry was inadequate. The proper test is whether the original inquiry by counsel was adequate in the light of facts he knew or should have known at the time the inquiry was undertaken. We are unable to conclude from the record before us that the inquiry was inadequate or that it was unreasonable for counsel to decide that a defense of diminished capacity should not be presented. Thus, even if we were able to conclude that counsel failed to discuss the possible defense of diminished capacity with defendant, such

---

[22]In *Saunders,* the defendant was charged with murder, robbery and assault with intent to commit murder. Prior to trial the defendant's mother wrote to counsel explaining that the defendant had suffered a fractured skull and two concussions, that prior tests showed organic brain damage, and that according to his doctor defendant did not on occasion understand the quality of his acts. This information prompted no inquiry by counsel and at the guilt stage of the trial no defense of diminished capacity was presented. After the guilt phase of the trial was completed, counsel received medical reports from the defendant's doctor who explained in a letter that his tests revealed an abnormal brain condition. Counsel made no attempt to reopen the guilt phase on the basis of this information and proceeded to the penalty phase where again no evidence of defendant's mental state was introduced. We granted relief to Saunders in a habeas corpus proceeding, explaining that "the possible defense of diminished capacity 'was withheld not through deliberate though faulty judgment, but in default of knowledge that reasonable inquiry would have produced, and hence in default of any judgment at all.' [Citation.]" (2 Cal.3d at p. 1049.)

failure could not have resulted in the withdrawal of a crucial defense. (See *In re Beaty, supra,* 64 Cal.2d 760, 764-765.)

To recapitulate, defendant has failed to establish that his trial counsel rendered ineffective assistance in advising him to enter a single plea of not guilty by reason of insanity to some of the charges or in thereafter acquiescing to defendant's insistence that he plead guilty to all charges.[23]

## IV

### *Validity of Guilty Pleas*

Defendant contends that his guilty pleas are invalid and must be set aside[24] because (1) they "were the result of internal compulsion caused by psychiatric disorder rather than a voluntary and intelligent waiver of his constitutional rights" and (2) they did not conform to the California Constitution (art. I, § 7), requiring a waiver of the right to trial by jury.[25]

In support of his argument that the pleas were involuntary, defendant refers to his testimony describing his suicide attempts prior to pleading guilty and to his counsel's testimony that he repeatedly insisted on pleading guilty, wanted to avoid a trial, and desired to accept punishment for his crimes without delay. Dr. Carfagni, testifying at the hearing on defendant's motion, described defendant's psychiatric condition as marked by a high degree of irrational guilt, impaired judgment and social disturbance. Because of this mental condition, Dr. Carfagni expressed the opinion that defendant was not acting of his own free will when entering the pleas. However, he agreed that defendant acted "freely and voluntarily" in pleading guilty, explaining that there is a distinction between "free and voluntary," as understood in the legal sense, and "free will." Defendant, who also testi-

[23]Having decided that trial counsel did not render ineffective assistance in any respect, we need not consider defendant's argument that appellate counsel was inadequate in failing to raise the errors committed by trial counsel.

[24]In support of this argument, defendant relies primarily on the evidence presented at the hearing on his motion to set aside the guilty pleas to the two murder counts. Although we have concluded that the trial court had no jurisdiction to hear the motion, unless it were construed as a petition for a writ of habeas corpus (see fn. 5, *ante*), the transcript of that proceeding is a part of the record in this case. Moreover, we granted defendant's motion to augment the record to include the transcript of the hearing.

[25]Defendant also contends that the pleas are invalid because they were "inevitably tainted" by the prior, illegal confession on August 12, 1966. The "taint" was not "inevitable" since defendant—had he not decided to plead guilty to the charges against him—could have moved to exclude the confession at trial on the basis of its alleged illegality.

fied at the hearing, agreed that he was not forced by anyone to plead guilty and that he pleaded guilty freely and voluntarily. When he entered the pleas, defendant understood that he was waiving his right to a trial by jury, his right to confront witnesses against him, and his right to call witnesses on his own behalf. Under these circumstances, we think that defendant has failed to establish that his mental condition prevented him from pleading guilty freely and voluntarily.

Defendant complains that when he entered single pleas of not guilty by reason of insanity to the two counts of murder, three counts of forcible rape, and to one count of oral-genital copulation, thereby admitting the commission of those crimes (§ 1016), the court did not require an express waiver of his right to trial by jury guaranteed under the California Constitution. (Art. I, § 7.) Since the pleas were accepted prior to the decisions in *Boykin* v. *Alabama* (1969) 395 U.S. 238, 242 [23 L.Ed.2d 274, 279, 89 S.Ct. 1709], and *In re Tahl* (1969) 1 Cal.3d 122, 130-133 [81 Cal.Rptr. 577, 460 P.2d 449], cert. den., 398 U.S. 911 [26 L.Ed.2d 72, 90 S.Ct. 1708], enunciating a rule of *prospective* application requiring on-the-record advisement and an express waiver by defendant of his right to a jury trial prior to acceptance of a guilty plea, defendant could not argue successfully that the *Boykin-Tahl* rule has been contravened.

Prior to *Boykin,* where the defendant attempted to waive the right of trial by jury in favor of a court trial, California law required that such a waiver be express. (*In re Tahl, supra,* 1 Cal.3d 122, 129, fn. 4; *People* v. *Holmes* (1960) 54 Cal.2d 442, 443-444 [5 Cal.Rptr. 871, 353 P.2d 583].) However, state law did not command an express waiver of a jury trial prior to acceptance of a guilty plea. (*In re Tahl, supra,* 1 Cal.3d 122, 129, fn. 4; *People* v. *Johns* (1959) 173 Cal.App.2d 38, 43 [343 P.2d 92].) As the law then existed a waiver of trial by jury was implicit in a plea of guilty. (Fricke & Alarcon, Cal. Criminal Procedure (7th ed. 1967) p. 187.) Consequently, in entering pleas of not guilty by reason of insanity without also pleading not guilty to certain charges, defendant not only admitted the elements of those charges (§ 1016; *People* v. *Walker* (1948) 33 Cal.2d 250, 260 [201 P.2d 6]) but he also waived the right of trial by jury. (*In re Jingles* (1946) 27 Cal.2d 496, 499 [165 P.2d 12]; *People* v. *Beckworth* (1957) 151 Cal.App.2d 842, 843 [312 P.2d 270].)

Furthermore, defendant subsequently entered guilty pleas to all charges, accompanied by a specific waiver of his right to a jury trial. Therefore, even if error had occurred when the original pleas were made, it was vitiated by the subsequent proceeding.

In Crim. No. 15018, the judgment on the single count of murder contained in the indictment numbered 10173, insofar as it provides for the penalty of death, is modified to provide a punishment of life imprisonment and as so modified is affirmed. As to count I of the indictment numbered 10134 charging murder, the judgment, insofar as it provides for the penalty of death, is modified to provide a punishment of life imprisonment and as so modified is affirmed. As to count X thereof, charging a violation of section 209, the judgment is reversed. In all other respects, each of the judgments in Crim. 15018 is affirmed.

In Crim. No. 16549, the order to show cause is discharged and the petition for a writ of habeas corpus is denied.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., and Clark, J., concurred.

**McCOMB, J.**—I concur except to the extent that the opinion modifies the death penalty on the murder counts.

Appellant's petition for a rehearing was denied July 3, 1974.