Filed 5/21/15  P. v. Lee CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRENDAN J. LEE et al.,<br><br>    Defendants and Appellants. | B254666<br><br>(Los Angeles County<br>Super. Ct. No. MA058292) |

APPEALS from judgments of the Superior Court of the County of Los Angeles, Eric P. Harmon, Judge.  Affirmed and remanded with instructions.

Gloria C. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant Brendan J. Lee.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Jayvion Ross.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendants Brendan Lee (Lee) and Jayvion Ross (Ross) guilty of, inter alia, kidnapping for robbery.  On appeal, defendants argue that the trial court committed prejudicial error when it failed to define accurately the asportation element of kidnapping for robbery.  Defendants further contend that even if the trial court did not commit prejudicial instructional error, they received ineffective assistance of counsel or that the cumulative effect of the nonprejudicial errors deprived them of their due process rights.  Defendants also argue that their respective abstracts of judgment contain clerical errors that must be corrected on remand.

The Attorney General agrees that the trial court's definition of the asportation element of kidnapping for robbery was erroneous, but nevertheless maintains that the error was harmless.  The Attorney General also agrees that there are clerical errors in the abstracts of judgment that require correction on remand.

We conclude that because the challenged instructional error was harmless, each of defendants' contentions based on that error are unavailing.  We also agree that the abstracts of judgment should be corrected on remand as specified below.

## FACTUAL BACKGROUND[1]

### A.      Count 10—Kidnapping to Commit Robbery of Ordaz

On November 26, 2012, Jose Ordaz was working as a deliveryman for a medical marijuana cooperative.  Sometime around 6:50 p.m., he received instructions to deliver medical marijuana to a new bedridden customer named Terrence in Lancaster.  As he drove his pickup truck to the address provided, he noticed residents moving about the neighborhood.  He parked his truck in front of the residence and retrieved two bags, one

---

[1]      Because defendants' claim of instructional error relates only to count 10, we state the facts relevant to that count, as well as the facts relevant to a similar count involving a different victim, count 6.

containing the medical marijuana and the other necessary paperwork. Ordaz went to the front door, rang the bell, and then knocked. Lee answered the door, and when Ordaz asked for Terrence, Lee "just smiled."

At that point, Ordaz heard the side gate open and saw Ross emerge with a handgun. Ross, who was wearing gloves, approached Ordaz on the porch and directed him "to put [his] stuff down." Ordaz responded, "'Are you fucking serious?'" which angered Ross, who replied, "'You think I'm fuckin' playin? . . . Put your shit down.'" Ross pressed the handgun against Ordaz's head while Lee took Ordaz's two bags, his "Blue Tooth ear piece," his cell phone, and his car keys. When Lee tried to search Ordaz's pockets, Ordaz pulled cash from his left pocket, threw it on the ground, and told defendants that he did not have anything else.[2]

Ross then pushed the gun "a little harder" against Ordaz's head and said, "'Go in the fuckin' house.'" Ordaz, who did not want to enter the house, asked defendants why they wanted him to enter. Ross "just pushed the gun a little harder" and Ordaz entered the house with defendants behind him. Ross said, "Get down" and Ordaz replied, "What do you mean?" As Ordaz moved into the entry hall, Ross kept saying, "Keep going and get down." Ordaz did not "get down" because he did not understand what Ross wanted him to do. When Ordaz had moved five or six feet into the entry hall, he turned a corner and reached for his knife so he could defend himself. Ordaz then heard a door close and noticed that defendants were gone. He surveyed the interior of the house looking for a way out.

Ordaz heard his truck start, went to a window, and saw defendants searching through his truck. Ordaz went to the front door and opened it, hoping to escape. But Ross saw him, exited the truck, pointed the gun at him, and said "'I told you to stay in there, you motherfucker.'" Ross ran toward Ordaz who reentered the house, went to a window, and climbed out. Ordaz heard the front door hit the interior wall and knelt down

---

**2** Contrary to his representation to defendants, Ordaz had a wallet and a knife in his pockets.

by a brick wall. He could hear defendants inside the house screaming, "'Where's this motherfucker at? I'm going to kill this motherfucker.'"

Ordaz began "jumping walls" between residences until he reached a backyard that he believed was a safe distance from defendants. He went around to the front yard of that house and asked a woman to call 911.

Ordaz met with the Sheriff's deputies who responded to the 911 call and returned with them to the house where he was robbed. Inside the house, Ordaz found a credit card in the name of Lee and a job application in the name of Ross. The next day, Ordaz searched defendants' names on Facebook and Instagram and found photographs that resembled the men who robbed him. When Ordaz was later shown photographic lineups, he identified the photographs of defendants as the men who robbed him.

### B. Kidnapping for Robbery of Lemburg

On October 13, 2012, Crystal Lemburg was working for an organization that delivered medical marijuana to customers. She received an order to make a delivery on Kirkland Avenue in Lancaster. She left about 11:00 a.m. to make the delivery to a person named Terrence Foley. It was a "normal Saturday morning" and Lemburg felt safe as she pulled up to the Kirkland Avenue residence. She parked in front of the residence, exited her car, and approached the front door. She noticed that the screen door was closed, but the front door was halfway open. Someone inside invited Lemburg to "come in," so she opened the door and walked inside the house.

As soon as Lemburg walked through the front door, the door shut behind her and someone grabbed her from behind and wrapped his arms around her "like a big bear hug." Then she saw a man coming toward her with his hand raised, as if he was about to attack her. Lemburg said, "Just take the stuff. I'm not going to fight you. I don't want any harm."

The two men in the house were wearing long-sleeved blue sweatshirts, bandanas across their face, and dark hats. All Lemburg could see was their eyes. One of the men

4

reached into her pockets and took her cell phone and car keys.  He also took the suitcase[3] that she was carrying.  The man restraining Lemburg asked her if she had any money and she said, "No."  The man then told her to walk into the other room, and he guided her there by squeezing her shoulders from behind.  Lemburg continued into a room that faced the street.  She was moved a total of 10 to 12 feet.  When Lemburg stopped, she was facing the window at the front of the house, a position from which she could not observe the two men who robbed her.

Lemburg next heard someone trying to start her car and put it in gear.  She heard the gears of the car "jamming," and she assumed they were unable to shift the manual transmission into gear.  She looked out the window, saw the two men in her car, and "took off out the side door into the backyard," where she "peeked through a little hole" in the wall to see if the men were still in her vehicle.  She then ran through the backyard and climbed a fence into a neighboring backyard.  Because a dog in that yard was "coming at" her, she "jumped over to the next neighbor" where she saw a couple on the porch.  Lemburg asked to use their cell phone and called 911.  From her location, Lemburg observed the two men who had robbed her exit her car and run down the street "with the items they had taken out of [her] hands."

## PROCEDURAL BACKGROUND

In an amended information, the Los Angeles County District Attorney charged defendants, inter alia, in counts 6 and 10 with kidnapping for robbery in violation of Penal Code section 209, subdivision (b).[4]  Following trial, the jury found, inter alia, defendants not guilty on count 6, but guilty on the lesser included offense of false imprisonment, and guilty as charged on count 10.

---

[3]     Lemburg estimated that there was $5000 worth of marijuana in the suitcase.

[4]     All further statutory references are to the Penal Code unless otherwise indicated.

5

On count 10, the trial court sentenced Lee to an indeterminate term of life with the possibility of parole, plus an additional term of one-year for the armed principle enhancement.  On count 6, the trial court sentenced Lee to a concurrent two-year term.

On count 10, the trial court sentenced Ross to an indeterminate term of life with the possibility of parole, plus an additional 10-year term for his personal use of a firearm. On count 6, the trial court sentenced Ross to a concurrent two-year term.

## DISCUSSION

### A.      Instructional Error

#### *1.       Background*

The trial court instructed the jury on counts 6 and 10—kidnapping for the robbery of Lemburg and Ordaz—with a modified version of CALCRIM No. 1203, which read as follows:  "The defendants are charged in Counts 6 and 10 with kidnapping for the purpose of robbery, and attempted kidnap for robbery against Lee only in count 12.  [¶] To prove that a defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant intended to commit robbery; [¶]  2.  Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear; [¶]  3. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶]  4.  The other person was moved or made to move a distance beyond that merely incidental to the commission of a robbery; [¶]  5.  When that movement began, the defendant already intended to commit robbery; AND [¶]  6.  The other person did not consent to the movement.  [¶]  To be guilty of kidnapping for the purpose of robbery, the defendant does not actually have to commit the robbery.  [¶]  To decide whether the defendant intended to commit robbery, please refer to the separate instructions that I will give you on that crime."

The foregoing modified instruction, however, omitted the following definition of "substantial distance" that is contained in CALCRIM No. 1203:  "As used herein,

6

*substantial distance* mean more than a slight or trivial distance. The movement must have increased the risk of [physical or psychological] harm to the person beyond that necessarily present in the [robbery/ [or] rape/ [or] spousal rape/ [or] oral copulation/ [or] sodomy/ [or] sexual penetration/ [or] _____ <insert other offense specified in statute>.) In deciding whether the movement was sufficient, consider all the circumstances relating to the movement." (CALCRIM No. 1203.)

The trial court also instructed the jury on counts 6 and 10 with CALCRIM No. 1215, which included a slightly different definition of "substantial distance" and read as follows: "The defendants are charged in Counts 6, 10 with kidnapping, and attempted kidnapping in count 12 as to Defendant Lee only. [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant took, held, or detained another person by using force or by instilling fear; [¶] 2. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; AND [¶] 3. The other person did not consent to the movement. [¶] *Substantial distance* means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the distance the other person was moved was beyond that merely incidental to the commission of Robbery, whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection."

During his closing argument, the prosecutor made the following statements concerning kidnapping for robbery: "So, first of all, for a kidnap for robbery, there has to be an intent to commit robbery. . . . The defendant will concede to you that there was an intent to commit robbery when the kidnaps began. [¶] Second, the movement that occurs during the kidnap is not incidental to the robbery. We'll talk about what that means through the examples that I have. [¶] Third, the movement was a substantial distance. [¶] . . . . [¶] So we're looking for any increase in the risk of harm, and it's actually

7

defined as psychological or physical risk of harm. It's a very broad standard. Within that risk of harm, an element that we're looking at, we're looking at three potential factors, and I will tell you right now there are factors that I believe are relevant. I don't believe they're in your jury instructions. One is the greater ability to commit crime. We're talking movement now, movement which put you in a place of greater ability to commit crime. [¶] Second, the risk of danger to a victim during the escape; and [¶] Third, movement when it enhances your ability to evade detection. That's when you're not in a place where you're not going to get caught, those are the factors. [¶] So the three main factors of intent to commit [kidnapping for] robbery are movement not incidental to the robbery, substantial forced movement. . . . [¶] Third, substantial and forced movement. Again, there's no magic number. You don't use a tape measure. It's not how it's done, rather you use three factors that show you whether there's any increase in the risk of physical or psychological harm. That way you're not limited to the factors. You can come up with other things that lead you to this conclusion that's—as in our case, there's an increase in the risk of physical or psychological harm."

After showing the jury a video of a different robbery in which the movement of the victim was merely incidental to the robbery, the prosecutor described a hypothetical robbery of a woman, Cindy, in which two robbers, Andy and Brad, moved her from the hallway outside a hotel room a few feet into the hotel room. On the element of substantial distance necessary for kidnapping for robbery in the hypothetical, the prosecutor explained: "Second, was the movement a necessary part of the taking? No. . . . [¶] Here's what the law says. Any increase in risk of physical or psychological harm, consider all the circumstances, and you have a kidnapping. Here's what it says. Is there an increased ability to commit crime? Well, if Andy and Brad are in this hotel room here and Cindy's taken out of that public view there, I don't know. Do you think she's . . . at greater risk? [¶] Let's count the crimes that could occur within the hotel room in which you have two intruders who are untraceable back to that room to commit this. Murder, rape, assault[,] battery, sexual assault. It's all now available because of that change. [¶] Increased risk to the victim because of a predictable attempt to escape?

8

Absolutely. When she tries to get out that front door and there are two people, two on one, it's going to be a problem for her. [¶] Decreased likelihood of detection. No one's going to see her when she's pulled out of the hallway. She's in big trouble. We're going to get to that in the case that we have with Mr. Ross and Mr. Lee."

The prosecutor next mentioned the substantial distance element in the context of the kidnapping for the robbery of Ordaz during his analysis of the evidence in support of count 10: "Let's talk about Mr. Ordaz and why he meets this as well. Again, three different elements. You have the intent to commit a robbery. Was the movement incidental or not to the robbery? Was there a substantial movement? Let's walk through it. [¶] Was the movement incidental or not to the robbery? Well, remember, Mr. Ordaz was taken at gunpoint by Mr. Ross from around the side gate here, pulled up to the porch. At the porch they take all of the property that they're going to take from him. They take it at the porch, and then they move him inside. The taking was complete. The movement is not incidental to the robbery. [¶] The taking of the property is done at that point, yet they still moved him inside. You may remember too Mr. Ordaz told you in his testimony. . . . Why do you need to force me into this house? [¶] That's the essence of kidnapping here. It's that change in conditions. We have the increased risk of danger from a predictable escape. How do we know that element is met, that factor is met? [¶] Well, when Mr. Ordaz gets left at Position 3, he pulls out his own knife. That's part of the danger that he feels. He's not sure he's going to get out alive at that point. And, of course, when he's stuck inside the house here at Position A, they have a totally increased ability to commit whatever crime they really want against him. [¶] And, in fact, we heard about them threatening to kill him as well, and there's virtually no chance they're going to get detected while they're inside of that vacant home because they're cordoned off and not in public view anymore. *That difference between being taken from the porch into the home is everything in this case.* It's all done with the gun that Mr. Ross is holding upon him as well." (Italics added.)

During his rebuttal argument, the prosecutor asserted that defendants' movement of Ordaz from the porch to the inside of the house increased the risk that Ordaz would

9

attempt to escape, as evidenced by Ordaz's testimony that, once inside the house, he reached for his knife so he could "fight" with the defendants. The prosecutor emphasized that "[a]n increased risk of harm is a factor in this case, and its what you must consider as a jury was there an increased risk of harm," including the consideration of factors such as decreasing the risk of detection and increasing the ability to commit other crimes. The prosecutor also argued that the fact that Ordaz was not physically harmed was irrelevant and that the issue was whether there was "any increase" in the risk of physical or psychological harm. According to the prosecutor, there was "no question about" whether the movement of Ordaz from the porch to the inside the house increased the risk of harm to him.

Ross's trial attorney argued as to count 10 that the prosecution could not establish the element that required a showing that Ordaz had been moved a substantial distance. Ross's trial attorney urged the jury to consider the "totality of the circumstances" when determining whether the prosecution had satisfied its burden on the substantial distance element. In addition to urging the jury to consider the actual distance Ordaz was moved, Ross's trial attorney told the jury, "You may also consider other factors; and, now, they're going to give you five suggestions. These are some factors you are allowed to consider. Notice it uses the word 'may.' You don't have to. You're permitted to consider these factors, such as, whether the distance the person was moved was beyond that merely incidental to the commission of robbery." He characterized the issue of whether the movement of Ordaz increased the risk of physical or psychological harm as "a comparative analysis." According to Ross's trial attorney, the risk to Ordaz decreased once he was moved into the house because the defendants almost immediately removed the gun from his head, shut the door, and left him alone. Ross's trial attorney also asserted that the risk that Ordaz would try to escape did not increase simply because he was moved inside the house and abandoned there. Although he conceded that the movement of Ordaz inside the house may have decreased the likelihood of detection, Ross's trial attorney maintained that the totality of the circumstances surrounding the movement of Ordaz showed that he had not been moved the requisite substantial

10

distance. Ross's trial attorney concluded that the evidence in support of count 10 showed, at best, that defendants had committed the lesser included offense of false imprisonment.

Lee's trial attorney began his analysis of the evidence in support of count 10 by explaining that the difference between kidnapping for robbery and false imprisonment was the substantial distance requirement for kidnapping. Lee's trial attorney then defined substantial distance using the omitted language from CALCRIM No. 1203, as follows: "As used here, substantial distance means 'more than slight or trivial distance. The movement must have increased the risk of physical or psychological harm to a person beyond that necessarily present in the robbery,' and then it goes on to determine these factors. These are factors that you should consider." In addition, Lee's trial attorney told the jury that as to the substantial distance element, they had an instruction on how to decide that issue and that the prosecutor had "to prove all of these elements beyond a reasonable doubt." Lee's trial attorney concluded that the prosecutor had failed to satisfy his burden as to the substantial distance element and that the evidence showed only the commission of false imprisonment.

### 2. *Harmless Error*

Defendants contend that the trial court committed prejudicial error when it failed to include the CALCRIM No. 1203 definition of substantial distance in the kidnapping for robbery instruction and instead instructed the jury with the definition of substantial distance contained in CALCRIM No. 1215. According to defendants, the omitted CALCRIM No. 1203 substantial distance definition would have required the jury to consider whether the risk to Ordaz was beyond that inherent in the robbery, whereas the CALCRIM No. 1215 definition made consideration of such increased risk discretionary. Defendants therefore maintain that the substantial distance definition in CALCRIM No. 1215 erroneously advised the jury that it could find that Ordaz had been moved the requisite substantial distance by considering only the actual distance he was moved and

11

that although the other factors, such as the increase in risk of physical and psychological harm, could be considered, the jury was not required to consider them.

The Attorney General concedes that the trial court's instructions on count 10 were erroneous because they did not expressly require the jury to consider whether the movement of Ordaz increased the risk of physical or psychological harm beyond that necessarily present in the robbery. Nevertheless, the Attorney General maintains that the instructional error was not prejudicial. According to the Attorney General, given the evidence concerning the movement of Ordaz from a public location to an isolated location inside a dark, vacant house, as well as the arguments of counsel concerning the substantial distance element of kidnapping for robbery, the omission of the CALCRIM No. 1203 definition of substantial distance was harmless beyond a reasonable doubt.

"Under *Chapman* [*v. California* (1967) 386 U.S. 18 (*Chapman*)], a federal constitutional error is harmless when the reviewing court determines 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' (*Chapman, supra*, 386 U.S. at p. 24.) When there is '"a reasonable possibility"' that the error might have contributed to the verdict, reversal is required. (*Ibid.*) . . . [¶] The reviewing court conducting a harmless error analysis under *Chapman* looks to the 'whole record' to evaluate the error's effect on the jury's verdict. (*Rose v. Clark* [(1986)] 478 U.S. [570,] 583.) We note in this regard that a *Chapman* harmless error analysis for instructional error typically includes review of the strength of the prosecution's case. (See, e.g., *Johnson v. United States* [(1997)] 520 U.S. [461,] 470 [concluding that the trial court's failure to submit the question of materiality to the jury in a perjury case was harmless in light of the overwhelming and uncontroverted evidence supporting that element].) Indeed, the harmless error inquiry for the erroneous omission of instruction on one or more elements of a crime focuses *primarily* on the weight of the evidence adduced at trial. Under *Neder* [*v. United States* (1999)] 527 U.S. 1, such an error is deemed harmless when a reviewing court, after conducting a thorough review of the record, 'concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' (*Id.* at p. 17; see *People v. Mil* (2012) 53 Cal.4th

12

400, 417-419 [135 Cal.Rptr.3d 339, 266 P.3d 1030] [applying the same standard to evaluate the effect of the erroneous omission of instruction on two elements of an offense].)" (*People v. Aranda* (2012) 55 Cal.4th 342, 367; see also *People v. Chun* (2009) 45 Cal.4th 1172; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1085-1089.)

### 3.  Legal Principles

Defendants were convicted on count 10 of the kidnapping for the robbery of Ordaz in violation of section 209, subdivision (b), a crime that is also referred to as aggravated kidnapping.  Section 209, subdivision (b) provides in pertinent part,  "(b)  [¶]  (1)  Any person who kidnaps or carries away any individual to commit robbery, . . .  shall be punished by imprisonment in the state prison for life with the possibility of parole.  [¶] (2)  This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."

"Aggravated kidnapping is for the purpose of robbery or certain sex offenses.  (§ 209[, subd.] (b)(1); see *People* v. *Stanworth* (1974) 11 Cal.3d 588, 598 [114 Cal.Rptr. 250, 522 P.2d 1058]; see generally, [*People v.*] *Rayford* [(1994)] 9 Cal.4th [1,] 20; *People v. Daniels* [(1969)] 71 Cal.2d [1119,] 1139.)  [¶]  With respect to asportation, aggravated kidnapping requires movement of the victim that is not merely incidental to the commission of the underlying crime and that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself.  (§ 209[, subd.] (b)(2); see *Rayford, supra*, 9 Cal.4th at pp. 12, 22; *People v. Daniels*, *supra*, 71 Cal.2d at p. 1139.)  'These two aspects are not mutually exclusive, but interrelated.'  (*Rayford, supra*, 9 Cal.4th at p. 12.)  [¶]  In determining 'whether the movement is merely incidental to the [underlying] crime . . . the jury considers the "scope and nature" of the movement. [Citation.]  This includes the actual distance a victim is moved.  However, we have observed that there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong.'  (*Rayford*, *supra*, 9 Cal.4th at p. 12; *People v. Daniels, supra*, 71 Cal.2d at p. 1128 ['to define the phrase "another part of the same county," in

13

terms of a specific number of inches or feet or miles would be open to a charge of arbitrariness'].)  [¶]  'The second prong of the *Daniels* test refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime].  [Citations.]  This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes.  [Citations.]  The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased.  [Citations.]'  (*Rayford*, *supra*, 9 Cal.4th at pp. 13-14, 22 [Evaluation of risk of harm includes 'such factors as "the defendant's motivation to escape detection," and 'the possible enhancement of danger to the victim resulting from the movement."']; *In re Earley* [(1975)] 14 Cal.3d [122,] 132.)"  (*People v. Martinez* (1999) 20 Cal.4th 225, 232-233.)

### 4.    Analysis

Based on our review of the whole record, including the evidence relevant to count 10 and the arguments of counsel concerning that count, we conclude that the instructional error about which defendants complain was harmless beyond a reasonable doubt.  The evidence concerning the incident involving Ordaz was uncontroverted.  It showed that Ordaz, while on the front porch of a residence in plain view of the public, was robbed at gunpoint by defendants.  That robbery had been completed there on the porch before defendants, with Ross pressing a gun to Ordaz's head, ordered Ordaz to enter the residence against his will.  Although defendants forcibly moved Ordaz only a short distance—five or six feet—the change in circumstances that resulted from the movement was substantial.  After that movement, Ordaz was no longer in the plain view of the public, but rather was isolated inside a relatively small space where defendants' conduct towards him could not be observed by anyone.  The movement and resulting change in circumstances concerned Ordaz to such a degree that he reached for his knife, determined to fight for his life against two men, one of whom was armed with a handgun.  Following the robbery, defendants placed Ordaz in a much more vulnerable position in which the

14

increased risk of additional crimes against him, such as assault or even murder, was greatly enhanced. (See *People v. Shadden* (2001) 93 Cal.App.4th 164, 169-170 [movement of victim 9 feet from an open area to a closed room created substantial risk of harm sufficient to satisfy asportation element of aggravated kidnapping]; *People v. Jones* (1999) 75 Cal.App.4th 616, 629-630 [critical factor that increased risk of harm sufficient to satisfy the asportation element of aggravated kidnapping occurred when defendant forced victim to move 40 feet and pushed her into car]; *People v. Salazar* (1995) 33 Cal.App.4th 341, 348 [movement of victim 29 feet from an outside walkway to bathroom with door closed increased risk of harm sufficient to satisfy the asportation element of aggravated kidnapping]; see also *People v. Arias* (2014) 193 Cal.App.4th 1428, 1435 [asportation element for simple kidnapping satisfied when risk of harm to victim was increased by move from a "public area" to inside an apartment]; and *People v. Smith* (1995) 33 Cal.App.4th 1586, 1594 [asportation requirement for simple kidnapping satisfied when defendant moved victim 40 to 50 feet from a driveway "which was open to street view" into a camper].) Thus, the substantial distance element of the kidnapping for robbery charge in count 10 was supported by overwhelming evidence.

In addition, the arguments of counsel demonstrate that the issue of increased risk of physical or psychological harm from the forced movement was repeatedly emphasized to the jury. Although neither the prosecutor nor Ross's trial attorney specifically advised the jury that the substantial distance element required an increase in the risk of harm beyond that inherent in the robbery itself, given the uncontroverted facts, it was evident that both attorneys were referring an increase in risk of harm to Ordaz that was over and above the risk he initially confronted on the porch during the robbery. Moreover, Lee's trial attorney specifically advised the jury that the increased risk of harm from the forced movement must have been beyond the risk necessarily inherent in the robbery itself.

Given the uncontroverted evidence and the arguments of counsel concerning the movement of Ordaz, there is no reasonable possibility that the error about which defendants complain contributed to the guilty verdict on count 10.

15

Defendants point to the jury's verdict on count 6—not guilty on kidnapping for the robbery of Lemburg, but guilty on the lesser included offense of false imprisonment—and argue that it demonstrates that the instructional error was prejudicial. According to defendants, the verdict on count 6 shows that the jury concluded that the movement of Lemburg into the house, which was similar to the movement of Ordaz, did not satisfy the substantial distance element of kidnapping for robbery. Therefore, defendants maintain that the jury must have concluded that the more violent nature of the robbery of Ordaz, by itself, elevated that offense from false imprisonment to kidnapping for robbery.

Contrary to defendants' assertion, the jury's verdict on count 6 demonstrates that it was the factual differences between the movement of the two victims in counts 6 and 10 that resulted in the different verdicts. In Lemburg's case, she was not forced into the house against her will at gunpoint after the robbery had already occurred. Instead, Lemburg voluntarily entered the residence where she was then robbed and physically forced to move into a different room. In Ordaz's case, he was robbed at gunpoint in plain view of the public, but no other crimes were threatened or committed against him at that point. Nevertheless, he was then forced against his will inside the residence into a dramatically different and substantially riskier environment that increased defendants' ability to commit other crimes against him. Therefore, the differences in the two verdicts bolsters our conclusion that the uncontroverted and overwhelming evidence in support of the verdict on count 10 renders the claimed error harmless beyond a reasonable doubt.

### B.      Ineffective Assistance of Counsel

Defendants contend that, to the extent the trial court's instructional error does not warrant reversal of their judgments of conviction, then they received ineffective assistance of counsel that warrants reversal of their judgments. According to defendants, the failure of their respective trial attorneys to object to the trial court's instruction on count 10 fell below an objective standard of reasonableness and there was no satisfactory explanation for their failures to object.

16

"'To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.' [Citation.]" (*People v. Johnson* (2015) 60 Cal.4th 966, 979-980.)

Even if the performance of defendants' trial attorneys was deficient as claimed, defendants cannot show the requisite prejudice to prevail on their claims of ineffective assistance of counsel. As explained above, the instructional error about which they complain was harmless under the federal constitutional standard, a conclusion which prevents them from establishing the requisite prejudice for a claim of ineffective assistance of counsel.

## C.   Cumulative Error

Defendants argue that even if the errors about which they complain were not prejudicial when reviewed individually, the cumulative effect of those errors deprived them of a fair trial. We have concluded that the asserted errors upon which these claims are based were not prejudicial. We reach the same conclusion after considering their cumulative effect.

## D.   Clerical Errors in Abstract of Judgment

Lee contends that the abstract of judgment reflecting his sentence contains three clerical errors: (i) it shows his conviction on count 1—conspiracy to commit robbery—as a serious *and violent* felony when that crime is not a violent felony (§ 667.5, subd. (c)); (ii) it shows his conviction on count 6—false imprisonment—as a serious and violent felony when that crime is neither a serious nor a violent felony (§§ 667.5, subd. (c) and 1192.7, subd. (c)); and (iii) it shows his conviction on count 10—kidnapping for robbery—as a violation of section 25400, subdivision (a)(2) when he was convicted of violating section 209, subdivision (b). Ross joins in Lee's contentions concerning the

17

clerical errors in the abstract of judgment to the extent they affect his abstract, and the Attorney General agrees with defendants' contentions.

Because we agree with defendants' contentions concerning their abstracts of judgment, those abstracts should be corrected. Lee's abstract of judgment should be corrected as follows: (i) as to count 1, the designation as a violent felony should be stricken so that it is designated only as a serious felony; (ii) as to count 6, the designations as a serious and a violent felony should be stricken; and (iii) as to count 10, section 25400, subdivision (a)(2) should be replaced with section 209, subdivision (b).

Ross's abstract of judgment should be corrected by striking the designation of his conviction on count 1 as a violent felony.

## DISPOSITION

The matter is remanded to the trial court with instructions to correct Lee's abstract of judgment as follows: (i) as to count 1, the designation as a violent felony should be stricken so that it is designated only as a serious felony; (ii) as to count 6, the designations as a serious and a violent felony should be stricken; and (iii) as to count 10, section 25400, subdivision (a)(2) should be replaced with section 209, subdivision (b). The trial court is further instructed to correct Ross's abstract of judgment by striking the designation of his conviction on count 1 as a violent felony. In all other respects, the judgments of conviction from which defendants appeal are affirmed.

MOSK, Acting P. J.

We concur:


KRIEGLER, J.


GOODMAN, J.[*]

---

[*] Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19