Filed 3/21/16  P. v. Nicolas CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PHILLIP ANTHONY NICOLAS,<br><br>Defendant and Appellant. | A143502<br><br>(Contra Costa County<br>Super. Ct. No. 140263-5) |

After a jury trial defendant Phillip Anthony Nicolas was convicted of felony false imprisonment (Pen. Code,[1] §§ 236, 237) and misdemeanor assault (§ 240) for acts committed against his wife (the victim).  In a separate proceeding, the trial court found true that defendant had sustained a prior strike conviction.  Defendant was sentenced to six years in state prison consisting of a three-year term on the false imprisonment conviction, doubled for the prior strike conviction.  The court imposed but stayed sentence on the assault conviction pursuant to section 654.

On appeal defendant seeks reversal, arguing that (1) his felony false imprisonment conviction was based on conduct that the Legislature could not have intended to be covered by the statutory offense; and (2) the trial court abused its discretion in making certain evidentiary rulings.  He also asks us to review certain sealed mental health records pertaining to the victim to determine whether those records contain discoverable information.  Having reviewed the trial record, as well as the sealed mental health

---

[1]     All further unspecified statutory references are to the Penal Code.

records, we conclude there are no errors requiring reversal of the judgment, and accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Prosecution Case

The victim testified that she was married to defendant and they had been together since 2009 but had separated on October 6, 2013.

On the evening of October 7, 2013, the victim and two friends were going to a fellowship meeting. The victim was driving her car and her friend Lisa Holmberg and another friend were passengers. The victim saw the defendant walking on the street and she stopped the car to talk to him. Both the victim and Holmberg argued with defendant. According to the victim, defendant, armed with a knife, jumped on her car, and she put the car in forward gear. Defendant jumped off the car and the victim backed up her car and left the area. The victim drove to the fellowship meeting, left her friends there, and then drove away.

Approximately 10 to 15 minutes later, the victim returned to the fellowship meeting. Holmberg told the victim that defendant was there. The victim was scared and left through the front exit. Defendant and Holmberg also left, following the victim out to her car. Once outside, defendant and Holmberg yelled at each other about defendant following the victim. Defendant took out a folding-blade knife and lunged at Holmberg, who was several feet away. The victim got between defendant and Holmberg because the victim did not want defendant to hurt Holmberg. The victim started hitting defendant with her keys, which were held in her hand, "trying to get him away from" Holmberg. Defendant grabbed the victim around her throat while she was still hitting him and either defendant threw the victim to the ground or they fell to the ground. Once on the ground defendant put his knife to the victim's throat and threatened to kill her. The victim was not cut but her throat was "all red from it afterwards." The victim repeatedly screamed, "Get him off me," because she could not get out from under defendant. When asked how long she and defendant were on the ground, the victim testified that it "[f]elt like quite a while. It could have been two minutes. I don't know. But felt like quite a while."

2

Several men came to the victim's assistance. The men pulled, hit, and kicked defendant, saying, "Let her go, man, let her go." Defendant replied he was going to kill the victim and slice her throat. The men who came to the victim's assistance ultimately grabbed defendant's knife and freed the victim. The victim went to her car and hid out. Several hours later the victim reported the incident to the police after she learned that the police were aware of the incident.

Kurt Anderson testified that while he was at the fellowship meeting, he heard what sounded like a woman in distress screaming. He and a couple of people ran outside to investigate. He observed from a distance of approximately 20 to 50 feet away from the front door, as defendant and the victim fell to the ground and began to struggle. There were other people standing around just yelling at defendant, "Stop; Stop," "Stop it." Seconds later, Anderson followed another man to where the defendant and the victim had fallen to the ground. Defendant was on his back with the victim on top of him. Defendant had one hand on the victim's throat and was using the other hand, in which he had a knife, "reinforcing his hold on her trying to make sure she didn't get away." Defendant said things like, "I'm gonna kill you," "I'm gonna slit her throat." Anderson grabbed defendant's head and another man took the knife from defendant. Anderson estimated that the time it took him to get to defendant and put his hands on defendant and the other man to disarm defendant was "probably ten seconds," but it did not seem so quick at the time. Once defendant was disarmed, Anderson let him go and defendant got up and fled the area. The victim and Holmberg also left the area.

Katrina Schickedanz testified that on the evening of the incident, she had seen Lisa Holmberg leave the fellowship meeting followed by the victim who left in a hurry. After the victim left, defendant stood up and Schickedanz went back to paying attention to the meeting. The witness next heard a woman screaming outside the meeting place. Taking "half a second" to react, Schickedanz and several other people ran outside. Once outside, Schickedanz saw defendant holding the victim down on the ground; he was on top of the victim and had one arm around her neck. The victim was shrieking as if she was afraid she was going to die and pleading with defendant to let her go. Several men were

3

struggling with defendant. Defendant was saying, "Let me go or I'll kill her." According to Schickedanz, "this all happened in a matter of seconds." Schickedanz called 911. [2]

At 7:00 p.m., Concord Police Officer Kyle Colvin responded to the 911 call. Arriving at the scene of the incident, a man gave Officer Colvin a black folding knife. Approximately two hours later, the victim and Holmberg came to the police department. Officer Colvin interviewed both Holmberg and the victim. Holmberg reported that outside the meeting place, defendant confronted both women, cursed at the victim, and pulled out a knife. Holmberg asked defendant what he was going to do with the knife. Defendant pointed the knife at Holmberg's face and "lunged" at her. At that point the victim got in between Holmberg and defendant to defend Holmberg. Defendant grabbed the victim and threw her onto the ground, putting her in a headlock and putting a knife to her throat. Several men intervened to get defendant off the victim. Defendant said, " 'If you don't let me go, I'll cut her throat.' " After struggling with defendant, the men were able to disarm him and get him to release the victim. Holmberg did not call the police because she was afraid.

Officer Colvin further testified that during his interviews with Holmberg and victim, neither woman mentioned their earlier interaction with defendant when he had a knife and jumped onto the victim's car. As to the incident after the meeting, Holmberg said she and the victim had left the meeting because they were bored, not because they were afraid of defendant. The victim did not mention that defendant had lunged at Holmberg with a knife and neither women mentioned that the victim had hit defendant with her keys in her hand. Holmberg did not indicate what she was doing after defendant lunged at her, when the victim intervened, or while the victim and defendant were on the ground. The victim did not report any statements made by defendant during the

---

[2]     Schickedanz initially testified that she had seen defendant holding a knife to the victim's throat. However, after hearing a portion of her recorded 911 call, Schickedanz conceded she only knew that defendant had a knife because some men had told her that they had taken a knife away from defendant.

4

altercation. Neither woman appeared to have sustained any injuries and the victim did not mention she had sustained any injuries.

As part of its case in chief, the prosecution was permitted to admit evidence regarding prior domestic violence incidents between the victim and defendant pursuant to Evidence Code section 1109. The victim testified that on January 24, 2013 defendant had chased her with a kitchen knife and a few months earlier defendant had punched her in the ribs causing bruising and requiring a visit to the hospital. After the January incident, defendant was arrested on January 24, 2013. That same day, Concord Police Department Detective Steve Harn interviewed defendant, and portions of the recorded interview were played for the jury. As to the January 24, 2013, incident, defendant admitted that after an argument the victim had fled the marital home and he chased after her to talk to her. He did not want her to leave in her car, so he took a little kitchen knife with him to let the air out of the car tires. Armed with the knife, defendant yelled at the victim, "get back to the house," he was "just letting the air out of the tires," and he "just wanted to talk to her." He did not intend to and did not use the knife against the victim. Defendant also admitted that on an earlier occasion he had punched the victim in her ribs because she had falsely accused him of cheating on her and he thought she was cheating on him. After this incident, defendant took the victim to the hospital because the victim was in pain. The victim did not file charges against defendant regarding either incident.

**B.    Defense Case**

Defendant testified he had known the victim for "three years" and they had been married for two years. On October 5, 2013, the victim threatened to kill him if he moved on with another woman. The following day, the victim and defendant separated and she left the marital home.

On October 7, 2013, defendant was walking down the street and he heard a car honking. He saw the victim driving her car. Holmberg and another woman were also in the car. The women called defendant "names." He got mad, and cursed at the women in reply. Defendant became concerned when it appeared that Holmberg was getting out of the car to attack him. He pulled out a knife to show that he was serious and to signal that

5

he did not want Holmberg near him. He did not know if Holmberg had a weapon; he had just recently met her and did not know her background. While still holding the knife, defendant asked the victim to give him the keys to their marital home. Defendant was about 10 yards from the victim's car when he made the request. While defendant was asking for the keys, the victim got really mad and she "gunned" the car and headed toward defendant. He thought she was going to try to run over him. Defendant did not move and stood his ground. The victim stopped the car right before crashing into him. Defendant was scared. The victim was smiling and laughing about the incident like it was nothing.

Fifteen minutes after the car incident, defendant went to the fellowship meeting where he knew the victim would be so he could talk to her about the keys to their marital home. When he arrived at the meeting the victim was not there but the other women riding with the victim earlier were there. Defendant sat down because he knew the victim would come back for her friends. The victim came into the meeting place, stayed for five minutes, and then left with her friends. Defendant followed the women to talk with the victim. He was "kind of angry" and scared at the same time. He approached the victim, and from a distance of 20 feet he called her "a coward" because she would not give him his keys. Holmberg ran toward defendant, her arms swinging with her hands in fists, "repeatedly punching in front of him." Defendant was frightened because he did not know Holmberg, he felt outnumbered "already," and he did not know if Holmberg had a weapon. He pulled out his knife, opened it and held it up at "shoulder height, maybe 12 inches in front of his body," and "held [his] ground." He did not lunge toward Holmberg or stab her. Holmberg stopped and backed away from defendant. At this juncture, the victim stepped in, "screaming and yelling," threw her keys at defendant, and started "swinging," actually hitting defendant. Defendant, in an attempt to stop the victim from hitting him, grabbed her and "just held her," and they both fell to the ground. Defendant did not push the victim to the ground; he thought they "tripped or something" or "she laid down" and he "fell with her." Defendant still had the knife in his hand, but he turned it so that he would not hurt the victim. As soon as defendant and the victim fell to the

6

ground, other people started to put their hands on him. Defendant did not drop the knife because he got scared when he saw people from all sides, "somewhere around six or seven." Defendant denied saying, "let me go or I will cut her throat," or anything about killing the victim. When "all of these guys" were on him, defendant dropped the knife because he knew he had messed up and he was sorry. He admitted he probably should have dropped the knife "a long time ago." Once he dropped the knife, he got up, left the area, and went home. During his altercation with the victim outside the meeting, defendant had in his mind the victim's earlier threat to kill him. He did not want to hurt either Holmberg or the victim, and he did not want to prevent the victim from leaving. In response to a single question by the prosecutor, defendant testified he had been convicted of burglary in 1997.

The jury was instructed to consider the following offenses: the charged offense of assault with a deadly weapon and the lesser-included offense of assault on Holmberg, the charged offense of assault with a deadly weapon and the lesser-included offense of assault on the victim, and the charged offense of felony false imprisonment and the lesser-included offense of misdemeanor false imprisonment of the victim. As to each of the charged offenses, the jury was asked to consider an additional allegation that defendant had personally used a deadly or dangerous weapon during the commission of those crimes. The jury was also advised to consider lawful self defense as a defense to the all of the charged offenses as well as the lesser-included offenses. The jury found defendant not guilty of both the charged offense of assault with a deadly weapon and the lesser-included offense of assault on Holmberg. The jury found defendant not guilty of the charged offense of assault with a deadly weapon, but guilty of the lesser-included offense of assault on the victim. The jury also found defendant guilty of the charged offense of felony false imprisonment of the victim, but found not true the additional allegation that in the commission of that offense he had personally used a knife.

7

## DISCUSSION

## I. Felony False Imprisonment Conviction

Defendant does not dispute that the evidence is sufficient to support his conviction for felony false imprisonment of the victim. He argues, however, that the Legislature did not intend the statute to apply to his conduct in this case where the violation of the victim's personal liberty - holding the victim on the ground for a matter of seconds - was merely incidental to an ongoing physical altercation. We conclude defendant's argument is unavailing.

In support of his arguments, defendant asks us to consider *Cotton v. Superior Court* (1961) 56 Cal.2d 459, 463-465 (*Cotton*)[3] and *People v. Daniels* (1969) 71 Cal.2d 1119, 1130-1131, 1140 (*Daniels*),[4] in which our Supreme Court discussed the asportation requirement for kidnapping and aggravated kidnapping in the context of the commission of other crimes. Relying on the reasoning of *Cotton,* defendant contends that " 'it does

---

[3]  In *Cotton*, the defendants were charged with, among other offenses, assault with a deadly weapon, aggravated assault, riot, and kidnapping, arising from an altercation at a farm workers' camp. (*Cotton, supra*, 56 Cal.2d at p. 461.) As described by the Supreme Court, the evidence demonstrated that during the altercation "persons were pushed to the ground, dragged around, chased, and assaulted." (*Id.* at p. 464.) "[T]he only movements that occurred were those natural in a riot or assault. . . . All 'asportation' . . . would appear to be only incidental to the assault and rioting." (*Ibid.*) In holding that the charge of simple kidnapping (§ 207) could not be sustained, the Court explained: "To us, it does not seem reasonable that the California Legislature, in enacting Penal Code section 207, intended the statute to apply to a case of assault or riot such as occurred in the case now engaging our attention. Such a holding could result in a rule that every assault could also be prosecuted for kidnapping under Penal Code section 207, as long as the slightest movement was involved. Where the movement is incidental to the alleged assault, Penal Code section 207 should not have application . . . ." (*Cotton, supra*, at p. 465.)

[4]  In *Daniels*, the Supreme Court addressed the scope of aggravated kidnapping (§ 209)*,* which applied to "every person . . . 'who kidnaps or carries away any individual to commit robbery . . . .' " (*Daniels, supra*, 71 Cal.2d at p. 1126.) The Court held that "the intent of the Legislature . . . was to exclude from [the statute's] reach not only 'standstill' robberies . . . but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Daniels, supra*, at p. 1139.)

not seem reasonable that the California Legislature . . . intended the [false imprisonment] statute to apply to a case of assault . . . such as occurred in the case now engaging our attention . . . [because] [s]uch a holding could result in a rule that every assault could also be prosecuted for [false imprisonment] under Penal Code section [236], as long as the slightest [restriction on] movement was involved.' " However, the precise argument advanced by defendant was made and rejected in two cases not cited by defendant, *People v. Straight* (1991) 230 Cal.App.3d 1372 (*Straight*), and *People v. Reed* (2000) 78 Cal.App.4th 274 (*Reed*), which we find both persuasive and dispositive of defendant's argument.

In *Straight*, *supra*, 230 Cal.App.3d 1372, our colleagues in the Sixth District Court of Appeal held that a defendant convicted of assault with intent to commit rape could also be convicted of felony false imprisonment. (*Id*. at pp. 1374-1375.) In rejecting arguments that the felony false imprisonment conviction was improper because the victim's confinement was incidental to and did not significantly increase the risk of harm to the victim over and above the assault, the court stated, in pertinent part: "Defendant's contention is that his conviction for false imprisonment is invalid under *People v. Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]. [¶] . . . [¶] . . . [¶] Defendant acknowledges that the *Daniels* rule requiring the elements of a movement not merely incidental to and substantially increasing the risk of harm over and above the underlying robbery does not apply to the offense of simple kidnapping proscribed by Penal Code section 207. (*People v. Stanworth* (1974) 11 Cal.3d 588, 598-599 [114 Cal.Rptr. 250, 522 P.2d 1058].) He also acknowledges that false imprisonment is a lesser-included offense of all types of kidnapping. (*People v. Martinez* (1984) 150 Cal.App.3d 579 [198 Cal.Rptr. 565].) He, nevertheless, rejects the People's compelling logic that '[a] fortiori, *Daniels* is inapplicable to the lesser offense of false imprisonment.' [¶] Defendant relies upon *People v. Moreland* (1970) 5 Cal.App.3d 588, 594-595 [85 Cal.Rptr. 215] ('much of the reasoning which supports *Daniels*, would also negative the possibility that a false imprisonment which is merely incidental to some other crime, is a separate offense.'). That case, however, is not persuasive. Its comment

9

concerning *Daniels* was dictum and made before *People v. Stanworth, supra*, 11 Cal.3d 588, clarified that the *Daniels* rule did not apply to simple kidnapping. [¶] Defendant's fallback position is that felony false imprisonment is more closely related to aggravated kidnapping than to simple kidnapping. This argument ignores the reasoning of *Stanworth*. [¶] *Stanworth* emphasized that the *Daniels* rule is uniquely suited to Penal Code section 209. (*People v. Stanworth, supra*, 11 Cal.3d at pp. 600-601.) It noted that the rule concerns one type of kidnapping which, by definition, involves the underlying offense of robbery, and contemplates an increase in the risk of harm over and above that present in a robbery. [¶] Like simple kidnapping, felony false imprisonment can occur in the absence of robbery or any other crime. [¶] We recognize that felony false imprisonment requires more harm than misdemeanor false imprisonment, and aggravated kidnapping poses more risk of harm than simple kidnapping. It does not follow, however, that felony false imprisonment is therefore an equivalent of aggravated kidnapping. Moreover, the type of transgressions underlying felony false imprisonment (violence, menace, fraud, or deceit) are distinct from that underlying aggravated kidnapping (robbery). [¶] We, therefore, decline to extend the *Daniels* rule to felony false imprisonment."

In *Reed, supra,* 78 Cal.App.4th 274, our colleagues in the Fifth District Court of Appeal held that a defendant convicted of robbery could also be convicted of felony false imprisonment. (*Id*. at p. 279.) In rejecting arguments that the felony false imprisonment conviction was improper because both offenses were simultaneously committed and the restriction of the victims' movement was incidental to, and had no separate purpose apart from, the robbery, the court stated, in pertinent part: "[W]hat [defendant] has completely overlooked in advancing [his] claim is that our high court has considered the incidental nature of the victim's movement *only* as it pertains to the asportation element of *kidnapping*. While the definition of that element has changed considerably over time, . . . kidnapping, be it simple or aggravated, requires a degree of asportation not found in the definition of false imprisonment. Indeed, false imprisonment can occur with *any* movement or *no* movement at all. Accordingly, the reasoning employed in the high

10

court's kidnapping cases has no application here." (78 Cal.App.4th at p. 284, fn. omitted.)

In all events, the record demonstrates that defendant's felony false imprisonment of the victim was not "merely incidental" to his assault of the victim.[5] Defendant's assault of the victim was *completed* when he first grabbed her and they fell to the ground. (§ 240 [assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another]; *People v. Colantuono* (1994) 7 Cal.4th 206, 216, fn. 7 ["[w]ith assault, conviction does not depend upon the defendant's specific intentions beyond the act itself as long as the conduct constituting the assault is likely to result in a battery;" "[t]herefore, the actions described above would be an assault (and battery) regardless of the person's mental state in grabbing the victim"].) Once on the ground, defendant committed the separate offense of felony false imprisonment as he forcibly compelled the victim to remain in a place where she did not wish to remain, restraining her for an appreciable length of time, whether ten seconds or two minutes, and not releasing her until the intervention of others. (See *People v. Tufunga* (1999) 21 Cal.4th 935, 949 ["[s]imple or aggravated assault and false imprisonment [are] . . . charges that might be brought against persons who use unlawful force in seeking to take back property they in good faith believe belongs to them"]; *People v. Fernandez* (1994) 26 Cal.App.4th

---

[5]     In addressing this issue, defendant asks us to view the evidence in a light most favorable to him — that he "did what was arguably the most reasonable thing he could have done when [the victim] started hitting him with her keys. He grabbed her and held on to her until someone intervened and the situation was diffused. . . ." However, the fallacy in defendant's argument is that the jury was not required to accept his testimony or the victim's testimony but could have and apparently did decide that the truth lie between the various versions of the altercation as viewed by the percipient witnesses. As our Supreme Court has explained: " '[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.' " (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67-68.) And, the jury was so instructed in this case. The trial court specifically advised the jury, "You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." (CALCRIM No. 105.)

11

710, 718 [evidence sufficient to support convictions of felony false imprisonment and battery where defendant restrained victim long enough for him to suffer over 20 kicks; restraint held not part of battery as defendant and his companions could have hit the victim without holding him down]; see also *Fermino v. Fedco, Inc*. (1994) 7 Cal.4th 701, 715 [tort of false imprisonment, which has same definition as the crime, is " ' "the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however, short" ' "]; *People v. Castro* (2006) 138 Cal.App.4th 137, 140-144] [evidence sufficient to support felony false imprisonment conviction where defendant made sexually suggestive comments to a 16-year-old girl on the street and grabbed her arm and pulled her toward him for "a matter of seconds" before she pulled away quickly]; *People v. Bamba* (1997) 58 Cal.App.4th 1113, 1123 [crime of false imprisonment is "[a]ny exercise of express or implied force which compels another person to remain where he does not wish to remain or to where he does not wish to go"].)

## II.     Trial Court's Evidentiary Rulings

### A.     Relevant Facts

Before trial, the prosecutor filed a motion in limine seeking to exclude certain evidence including any mention of the victim or other prosecution witnesses being arrested by police or law enforcement on prior occasions. The prosecutor also sought to exclude prior convictions or criminal acts of certain prosecution witnesses as more prejudicial than probative under Evidence Code section 352. Lastly if defendant chose to testify, the prosecution sought to impeach him with several felony convictions all committed in 1997, and the underlying conduct of two misdemeanor convictions for thefts, also committed in 1997.

At a pretrial hearing, the trial court first discussed the prosecutor's request to use defendant's felony convictions and misdemeanor conduct for impeachment purposes. After argument by counsel, the court limited the prosecution's impeachment of defendant to asking a single question –"Isn't it true that in 1997, you were convicted of two [felony] counts of commercial burglary?" The court allowed the limited impeachment apparently to address the prosecutor's concern that if all of defendant's criminal acts were excluded

12

defendant would be allowed to present "a false aura of veracity" if he chose to testify. However, the court precluded any reference to the underlying facts of the felony commercial burglary convictions and defendant's other felony convictions for assault with a deadly weapon on a peace officer and reckless evasion of peace officers and his misdemeanor theft conduct. In so ruling, the court noted it was concerned about the use of defendant's 1997 felony convictions for violent conduct being used to impeach his credibility because the convictions were "so old."

As to the prosecutor's requests to limit defendant's confrontation of certain prosecution witnesses, the trial court excluded any questioning of the witnesses regarding the "fact of [an] arrest." As to the use of prior convictions, the court prefaced its rulings by stating that it was not inclined to allow the admission of "misdemeanors or acts," and in evaluating the admission of felony convictions the court would consider the remoteness of the conviction and its relevance to a witness's credibility. Thus, the court, pursuant to Evidence Code section 352, excluded use of (1) the victim's 1995 arrest for transportation of methamphetamine and 1998 misdemeanor conviction for possession of narcotic paraphernalia, (2) the victim's 2002 conviction for domestic violence battery and 2003 conviction for assault with a caustic chemical on the grounds that those convictions were "just too old and not particularly probative," and (3) the victim's 2002 felony conviction for battery on a peace officer on the ground that the conviction did not "show dishonesty such that it would affect credibility in any meaningful way and certainly the age" of the conviction "militate[d] against its use." The court also excluded use of (1) Holmberg's 2008 misdemeanor conviction for violating section 470, subdivision (d) (forgery) after finding the conviction was not "terribly probative;" (2) Anderson's 2004 misdemeanor conviction for second-degree burglary after finding it was a 10-year-old misdemeanor; and (3) Anderson's 2005 misdemeanor conviction for domestic violence (§ 237.5) and 2007 misdemeanor conviction for vandalism after findings that those convictions were "old," "might cause confusion for the jury," and were "[n]ot particularly relevant on the issue of credibility."

13

Defendant then informed the court that he was claiming self-defense and "without promising" that he would or would not testify, he sought to question the victim about two prior acts of violence: (1) a 2002 incident of "domestic violence," "elder abuse," which the victim allegedly committed against a gentlemen in his 70s; and (2) a 2003 incident in which the victim "breaks into – or busts into a neighbor's apartment and throws bleach on a number of people" and for which defendant had subpoenaed the investigating police officer. The court tentatively ruled that even if defendant did raise a plausible self-defense theory, the court did not believe evidence of the victim's prior conduct "would overcome the 352 concern," and the court "did not see how these two de minimus incidents . . . would be admissible given the context and the law."

Before the taking of any testimony, defendant filed a motion asking the court to reconsider its in limine ruling regarding the exclusion of the victim's 2002 and 2003 violent acts of battery and assault in support of his claim of self-defense. Defendant argued the trial court could not exclude the proffered evidence merely because the trial would be simpler and without making a finding of any tangible prejudice to the prosecution's case if the proffered evidence was admitted at trial. The trial court denied defendant's motion for reconsideration in the following manner: "[T]he Court [did] not decide under 352 not to let these acts in because it simplifies the trial. The Court decided not [to] let the acts in for several reasons. [¶] First of all, it's a little hard to tell how probative they are since I don't know what exactly the defense evidence is as regards self defense. I don't know anything. I have no idea what the defense evidence is, so let me put it that way. So I have to look to the other factors under 352, which has to do with remoteness in time. The case before me happened October of 2013. The incidents requested to come in occurred in 2002 and 2003. So to the Court, they are remote in time; particularly, when there [does] not appear to be any intervening acts. Similarly to my analysis of [defendant's] prior acts of violence, I don't see a succession of assaultive behavior since 2003. So I don't find them persuasive in that regard. And the acts themselves that are involved, one, involves pushing her boyfriend, that was March 10th, 2002; the custodial peace officer, which happened April 23rd 2002, involves not wanting

14

to . . . allow a cavity search; and number three, the assault with caustic chemicals from October 21st, 2003, involves a spray bottle of bleach, none of which are of such an appalling nature that the Court would find them particularly relevant in this case."

After defendant concluded his testimony, he renewed his request to testify regarding his knowledge of the victim's commission of the 2002 domestic violence incident and the 2003 bleach spraying incident. He argued he should be allowed to testify as to why he was afraid of the victim because the prosecutor's cross-examination opened the door for such testimony. As an offer of proof, defense counsel indicated that defendant was aware of the two mentioned incidents because the victim had told him about them and he was prepared to so testify. The court denied defendant's request, noting that none of the prosecutor's questions had changed the court's previous Evidence Code section 352 analysis by which it had precluded the use of those prior acts of violence.

### B.  Analysis

Defendant argues that the trial court abused its discretion and violated his constitutional due process rights by excluding all evidence tending to impeach the prosecution's witnesses or to support his claim of self-defense. For the reasons we now discuss, we conclude defendant's arguments are unavailing.

Defendant initially complains that, except in one instance, the trial court explicitly stated it was considering only the probative value of the evidence, but did not explicitly state it was also considering the prejudicial effect of admitting the evidence, when it made its Evidence Code section 352 rulings. However, "the trial court ' "need not expressly weigh prejudice against probative value . . . or even expressly state that [it] has done so . . . ." ' when it makes its rulings. (*People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 CalRptr.2d 396, 801 P.2d 1107].)" (*People v Riel* (2000) 22 Cal.4th 1153, 1187-1188.) In this case, the "record as a whole shows the court was well aware of, and

15

consistently performed, its duty . . . to balance the probative value of evidence against any prejudicial effect." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1053.)

In challenging the trial court's rulings excluding the use of the prosecution witnesses' misdemeanor convictions, defendant "recognizes that a witness' misdemeanor convictions, even if for crimes of moral turpitude, would not have been admissible for impeachment. (See, e.g. *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1131-1132.)" He argues, however, that "[h]ad the trial court not barred [him] from doing so he could nevertheless have cross examined prosecution witnesses regarding the conduct underlying [their] misdemeanor convictions," citing to *People v. Wheeler* (1992) 4 Cal.4th 284, 295 (*Wheeler*). The problem with defendant's argument is that, except for certain acts of violence committed by the victim, which we address separately, defendant "made no such argument at trial" that the court should admit evidence of the underlying misdemeanor conduct, and he "did not ask to present any such evidence, and made no offer of proof. Accordingly, we do not know what the underlying conduct was, whether or how it would have been significant, how defendant would have attempted to prove it, or whether he could have done so." (*People v. Chatman* (2006) 38 Cal.4th 344, 373 (*Chatman*).) Consequently, we deem defendant's argument forfeited for appellate review. (*Id*. at p. 373.) In all events, "[t]urning to the merits, it is difficult to judge the correctness of a ruling the court was never asked to make." (*Ibid*.) We cannot find that "the court would have erred in excluding the evidence when the record does not disclose what that evidence would have been — other than involving" certain criminal acts committed by the victim, Holmberg, and Anderson, "under unknown circumstances . . . ." (*Ibid*.) Thus, "the record presents no basis to conclude that excluding the evidence would have been an abuse of the court's broad discretion. (See *Wheeler, supra*, 4 Cal.4th at pp. 296-297.)" (*Chatman, supra*, at p. 373.)

We also see no merit to defendant's challenge to the trial court's rulings excluding the use of the victim's 2002 felony conviction for battery of a custodial officer, 2002

16

misdemeanor conduct of domestic violence battery, and 2003 misdemeanor conduct of assault with a caustic chemical.  The trial court could reasonably exclude the evidence on the grounds of remoteness and the nature of the prior criminal conduct vis-à-vis its relevancy to the victim's credibility.  (See *People v. Rist* (1976) 16 Cal.3d 211, 222 ["[a]s a general rule, convictions which are assaultive in nature do not weigh as heavily in the balance favoring admissibility as those convictions which are based on dishonesty or some other lack of integrity"]; *People v. Pitts* (1990) 223 Cal.App.3d 1547, 1554 [trial court acted within its discretion in excluding victim's 10-year-old murder adjudication on the grounds of remoteness]; *People v. Burns* (1987) 189 Cal.App.3d 734, 738  ["[t]here is no consensus among courts as to how remote a conviction must be before it is too remote"]; *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 448, fn. 4 ["[a]t some point in time . . . evidence of the victim's character becomes too remote to have any probative value and thus becomes irrelevant"].) [6]

We also reject defendant's argument that the exclusion of the proffered evidence prevented him from presenting a claim of self-defense.  Concededly, "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense." (*People v. Reeder* (1978) 82 Cal.App.3d 543, 553.)  However, "this does not mean the trial court

---

[6]     Defendant acknowledges the victim's 2002 and 2003 convictions were old, and "absent intervening acts of violence, the probative value of this type of evidence may go down over time."  He asserts, however, that the record "strongly suggests" that the victim was not at liberty during most of intervening years, and therefore, the remoteness of the incidents did not "substantially reduce" their probative value.  He also asserts that the trial court refused to allow the victim to be impeached with evidence of her felony conviction for battery on a peace officer at least in part because she was found not guilty by reason of insanity in connection with that conviction, but allowed defendant to be impeached with prior burglary convictions as to which the same finding of not guilty by reason of insanity was made.  However, defense counsel did not ask the court to consider these arguments at the time the court made its rulings.  Consequently, we decline to now consider them in evaluating the trial court's ruling for an abuse of discretion.

17

constitutionally was compelled to permit [him] to introduce all possibly relevant evidence on [the defense] despite its marginal relevance [and] the possible effect upon the jury's ability to remain focused on the issues before it (rather than becoming sidetracked on collateral questions) . . . ." (*People v. Fuiava* (2012) 53 Cal.4th 622, 665 (*Fuiava*).) While another trial court might have allowed the proffered evidence, "[t]hat fact, however, reveals nothing more than that a reasonable difference of opinion was possible. Certainly, it does not establish that the court here 'exceed[ed] the bounds of reason. . . .' (*People v. Stewart* [(1985) 171 Cal.App.3d 59,] 65.)" (*People v. Clair* (1992) 2 Cal.4th 629, 655.)[7]

In all events, applying any standard of review (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836), we conclude that any error was harmless as the excluded evidence did not deprive defendant of his due process rights to confront his accusers and present a complete defense. The testimony of the prosecution witnesses was largely consistent with each other, and defendant's guilt was supported by his own testimony. Given the independent witnesses' testimony, and defendant's testimony that he did not drop his knife and release the victim until after the intervention of others, we are confident that it is not reasonably probable that the jurors would have returned more favorable verdicts if they had heard evidence of the prosecution witnesses' prior criminal conduct and convictions.

---

[7]    Defendant also argues that the trial court failed to apply the same standards when evaluating impeachment evidence proffered by defendant as it used when evaluating evidence of the same type proffered by the prosecution, and that the trial court's rulings were biased in favor of the prosecution. However, these issues are raised for the first time on appeal, and in all events, we see nothing in the record that supports defendant's arguments, "and therefore, his claim that his constitutional rights to due process and a fair trial were violated in this manner is without merit." (*Fuiava, supra,* 53 Cal.4th at p. 678.)

18

**III. In Camera Court Review of The Victim's Sealed Mental Health Records**

Defendant asks this court to review in camera certain sealed mental health records regarding the victim's hospitalization at Napa State Hospital to determine if the trial court abused its discretion when it found the records did not contain any discoverable information that would be relevant to the victim's competence to testify or defendant's claim of self-defense. The Attorney General does not oppose defendant's request for an in camera review of the sealed records by this court. We note that the trial court reviewed only a portion of the sealed records to determine whether they contained discoverable information relevant to the issue of the victim's competence to testify. However, in the interest of judicial economy, we have reviewed all of the sealed records submitted to this court and conclude there is no discoverable information relevant to either the victim's competence to testify or defendant's claim of self-defense.

**DISPOSITION**

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

*People v. Phillip Anthony Nicolas*, A143502

19